IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO 08-22033-CIV-ALTONAGA/BROWN

ELLEN GREENFIELD

      Plaintiff,

v.

KENT SECURITY SERVICES, INC.,

      Defendant.

_____/

### DEFENDANT'S REPLY IN SUPPORT OF ENTRY OF SUMMARY JUDGMENT

    Defendant,  KENT SECURITY SERVICES, INC. ("KSS"), pursuant to Rule 56(c) and Local Rules 7.1 and 7.5 serves its reply in support of its Motion for Summary Judgment.

### Direct Evidence

    Plaintiff's "direct evidence" of pregnancy discrimination and retaliation falls short of the threshold set by the Eleventh Circuit.    As noted in Carter v. City of Miami, 870 F.2d 578 (11th Cir. 1989) and repeatedly upheld in later cases, not every comment concerning a person's protected status is direct evidence of discrimination:

> . ... "remarks merely referring to characteristics associated with [a protected status], or facially neutral comments from which a plaintiff has inferred discriminatory intent, are not directly probative of discrimination... Rather, courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected status] to constitute direct evidence of discrimination. [10]

Furthermore, comments that are merely "inappropriate and condescending," are not the kind recognized by this Circuit as direct evidence of discrimination.  Id.  Plaintiff's recitation

in ¶ 21 her Declaration of purported remarks made by Mr. Neuman that she was getting "so big"and "fat"[1], asking if she would "be able to walk", or if she was going to "give birth on the table " fall into this latter category.   Even a statement like " if I'd known you were pregnant, I would not have hired you." has been found ***not*** to be direct evidence of pregnancy discrimination.   Walker v. Golden Pantry Food Stores, Inc. 2005 U.S. Dist. LEXIS 40430, (M.D. Ga. 2005).

Similarly the alleged quotes in her Response are not "direct evidence" because they are inadmissible hearsay (statements allegedly made by Leyda Tollentino, Gil Neuman, Orly Alexander, Henry Hartley),[2] stray remarks by non-decision makers (Henry Hartley, Orly Alexander),[3] an alleged statement ***made in Hebrew***[4] for which Plaintiff admittedly

---

[1]   See Leach v. Prudential Signature Real Estate, 2006 U.S. Dist. LEXIS 1343 (W.D. Mo. 2006)[telling a pregnant plaintiff she was getting "fat" may be insensitive but is not sufficiently hostile to affect term or condition of employment].

[2]   Statements attributed to Leyda Tollentino, a paralegal who formerly worked for Defendant,  are the most rank form of hearsay.  Ms. Tollentino has never been deposed nor has Plaintiff filed her sworn affidavit.   Thus cites to Ms. Tollentino's alleged remarks in Plaintiff's Declaration, motion response and Statement of Opposing Fact are completely inappropriate and must be stricken and ignored. Plaintiff previously was admonished by the Court for including statements attributable to Ms. Tollentino in a pleading filed with this Court. See DE 42.   Defendant intends to move to strike portions of Plaintiff's declarations, motion response and Statement of Opposing Fact which repeat and rely on inadmissible matters such as opinion, hearsay or speculation.

[3]   Mr. Hartley denied making such statements at his deposition.  See Exhibit 2 attached.   Plaintiff also takes liberty with Maria Garcia's testimony by adding that Ms. Alexander allegedly made this remark "upon learning of Plaintiff's pregnancy."  See page 6 of Response.   Ms. Garcia did not testify when she allegedly heard Ms. Alexander made this purported remark. See M. Garcia Depo, p. 12.   And while Ms. Alexander may be a 50% owner of the business, Plaintiff has not established that Ms. Alexander had ***anything*** to do with her demotion.   Mr. Neuman testified that he made the decision [G. Neuman Depo, p. 13].   The statement attributed to Ms. Alexander does not even relate to what Plaintiff complains constitutes pregnancy discrimination.   And the person who allegedly heard the statement, Maria Garcia was not even employed by

lacks fluency  [E. Greenfield Depo, pp. 6-7] and for which she fails to provide an official translation; and statements that are simply ambiguous. [5]  These are not the types of "blatant remarks" that constitute direct evidence of discrimination because they require the listener to draw an inference that Plaintiff's gender or pregnancy was the underlying motive.

For example, assuming the Court held that the remark attributed to Mr. Neuman about "trying to get rid" of a Vice President, Sales (if it was made at all) in Mr. Hurley's declaration is not hearsay,  it can just as easily be inferred that this statement was made in **_response_** to continued negative feedback from managerial team members **_(such as Mr. Hurley)_** about Plaintiff, or due to Mr. Neuman's perception that Plaintiff had more interested in surfing the internet to shop and find a new house than fulfilling her role to hire, motivate and train a stable sales team that could and would meet established quotas.  Likewise, it can be inferred from the purported hearsay remark "Why would I want to talk to someone who is trying to sue me ?" attributed to Mr. Neuman in ¶5(c) of Mr. Hurley's declaration speaks of an intent to distance himself from Plaintiff to insure that she– then claiming

_____

Defendant at a time when Plaintiff had issues with her commission requests.

[4]  See Tab 18, Defendant's Appendix, L. Tollentino Investigative Notes, ¶ 8. Plaintiff related to Ms. Tollentino "Orly then proceeded to pick up her phone from speakerphone, with Gil on the other end and started speaking **_in Hebrew_**.  Ellen states that she **_inferred_** the meaning of Orly's words because Ellen went to Hebrew school when she was young." [Emphasis Supplied].   Because Plaintiff is not fluent in Hebrew, she may not present her own translation to support the truth of the matters asserted.

[5]  Mr. Neuman, the CEO of a corporation which relied on Plaintiff's successful performance of her job to obtain new sources of operating revenue had a legitimate interest in knowing details about Plaintiff's pregnancy, such as the date she was due, whether she intended to take maternity leave, the frequency of doctor's appointments. Questions such as this are not direct evidence of pregnancy discrimination.  See Lassiter v. Neurological Surgeons PC, 2008 U.S. Dist. LEXIS 100261 (M.D. Tenn. 2008). [question asked within 5 weeks of termination].

pregnancy harassment– does not perceive continuing harassment by him, and also to prevent further accusations of discriminatory conduct. [6]

Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence.  Earley v. Champion Intern. Corp., 907 F.2d 1077, 1081-82  (11th Cir.1990).     Thus, Plaintiff's pregnancy discrimination and retaliation claims must rest on her ability to establish a prima facie case using the McDonnell-Douglas paradigm.

<u>Plaintiff's Proof that she was "Qualified"</u>

The evidence Plaintiff offers to establish that she was qualified to be Vice President, Sales is a self-serving declaration of her "extensive sales experience" in both a "managerial and non-managerial" positions  [¶ 4 of E. Greenfield Declaration] and the personal opinions of Jill Shavelson (a former salesperson she supervised)  and Patrick Hurley (former President, KSN).     Plaintiff's own opinion of her skills does not establish that she was qualified.  See Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997). See also, Connor v. State Farm Mutual Automobile Ins. Co., 2008 U.S. App. LEXIS 7969 (6th Cir. 2008); Ward v. Midwestern State Univ., 2007 U.S. App. LEXIS 2864 (5th Cir. 2007).  Nor do the opinions of co-workers.  Gamble v. Aramark Uniform Services, Inc., 132 Fed. Appx. 263 (11th Cir. 2005).    To the extent Plaintiff could ground her self-assessment on the entries in her resume,  [See Defendant's Appendix to Summary Judgment at Tab 3], she fails.

---

[6]    Plaintiff admits that soon following her 4/8/07 email to Mr. Neuman complaining about pregnancy discrimination, he asked Office Manager, Rose Cucurillo to serve as their go-between [See. E. Greenfield notes for 4/ /07   ].  She also admits that Mr. Neuman communicated with her via email after that point.  [Id, pp. 239, 244: 12-15].

Immediately prior to accepting employment with KSS,  Plaintiff held a similar position with Integrated Security Systems, Inc. ("ISS").  Plaintiff's job performance also was an issue at ISS.   ISS President Jeffrey Nunberg ***repeatedly counseled*** Plaintiff about her failure to produce sufficient sales. [7]/[8]  Eventually, ISS reduced Plaintiff's salary as a result of poor performance. [9]  See Exhibit A,  Declaration of Jeffrey Nunberg, Appendix to Reply.  The mere fact that Plaintiff held a managerial sales position at a prior employment is not conclusive of the issue of qualification, especially when she was determined to be unsuccessful in meeting job expectations. [10]

Likewise,  Plaintiff attempts to overcome the hurdle of "qualification" posed by <u>Baker v. Sears, Roebuck & Co.</u>, 903 F.2d 1515 (11th Cir. 1990) by claiming–- ***for the first time***

---

[7]   Like Mr. Neuman, Mr.  Nunberg never documented these counseling sessions in writing.   See Exhibit A,  Declaration of Jeffrey Nunberg.  To the extent that Plaintiff argues she must have been qualified because otherwise there would be written reprimands, performance evaluations or disciplinary memos in her personnel file, see Response, p. 11, bullet point 4, she also would need to show that the employer had a practice of documenting poor performance.  Plaintiff's flagging performance at her subsequent employer, Marksman Security, Inc., also was not documented. (Deposition of Ezekiel Kaufman taken on 6/5/09 to be filed upon trancription).

[8]  Plaintiff's allegation in ¶ 4 of her Declaration that she never had monthly quotas at any prior job is contradicted by Mr. Nunberg's declaration.

[9]  In fact, Plaintiff's employment history with ISS is a virtual mirror of what occurred at KSS.   She accepted a managerial position, became pregnant, failed to meet the employer's expectations for sales production, suffered a salary loss and change in responsibility and then quit within a month of the effective date of the change.  See Exhibit A , Declaration of Jeffrey Nunberg.

[10]   The ISS position was Plaintiff's only managerial sales experience prior to her employment with KSS.  Plaintiff was a Senior Marketing Consultant [Exhibit 7, Response to Interrogatory No. 16] and her duties included training new marketing employees. [E. Greenfield Depo, pp. 18-19.] Her position at Data Warehouse involved mostly inside sales in a call center setting.

***in this entire case*** -- that her sales quota [11] was $5 million in sales ***a year*** instead of the $1.05 million per month [12] stated in the documents ***she produced*** in response to a request for:  "All documents containing any procedures, terms and/or conditions of your alleged employment with Kent Security Services, Inc."  See, Exhibit 6.   That this new position is designed ***only to avoid entry of summary judgment*** is evidenced by the following colloquy at Mr. Neuman's deposition.

> Q.    [By Mr. Celler]    Would you agree, are Exhibits 1[email dated 8/26/06] 6 [letter format of email dated 8/26/06] and 2 [letter from G. Neuman to E. Greenfield] consistent when you read them together, with your understanding as to what Ms. Greenfield would be paid, ***what the expectations of her job were*** and what her benefits were ?

> A.    [By Mr. Neuman]  Yes.

> Q.    Would you agree that if we took all three of the documents that we're looking at, Exhibits 1, 6 and 2, that ***it would be fair for her to rely*** on what is contained in here to know how much she was getting paid, for example ?

> A.    Yes.

> Q.    ***What the job expectations of her were*** ?

> A.    **Yes**

> ......

---

[11]   ¶ 11 of her Complaint admits that Plaintiff had "sales quota***s***". [Emphasis Supplied].

[12]   To support her new premise, Plaintiff misquotes Mr. Neuman's deposition testimony.   What Mr. Neuman actually testified to was that Plaintiff ***represented to him*** in negotiations that she would ***"grow"*** the prior year's revenue by $5 Million. [Pl. Exhibit 2, G. Neuman Depo. pp. 366:23 and 367:1], not just ***make*** $5M in annual revenue. Mr. Neuman further testified that he did not believe the total sum spent on Plaintiff's salary and benefits package was worth the revenue she and her sales team were producing.   "We did not ***grow*** by five million but we spent big money."   [Pl. Exhibit 1, Depo of G. Neuman, p. 367:3-4].

Q.     So is it fair to say that if **_we take the three of these documents and put them together, can we refer to this as the employment offer package_** ? Is that a fair characterization ?

A.     **Yes.**

[G. Neuman Deposition, pp. 74-75].   Plaintiff established the terms and conditions of her employment **_through documents_** that her counsel **_defined_** to include the letter drafted by Mr. Neuman that specified $800,000 a month in new sales of security services and $250,000 a month in sale of FISI products.    Moreover, she specifically identified Mr. Neuman's offer letter as **_supporting her claim_** in response to an interrogatory.   See Exhibit 7.[13]

Plaintiff also was shown the same documents marked as Defendant's Exhibits 4 and 5 at her deposition and asked:

Q.     [By Ms. Langbein]. So is there anything as far as Defendant's Number 4 and Defendant's Number 5 that you believe did not become a term and condition of your employment ?

A.     I think there might have been some **_minor changes_**.

[E. Greenfield Depo pp. 60-61].     She also was asked:

Q.     I know that we disagree about whether the email that Mr. Neuman sent to

---

[13]     Exhibit 7 is further evidence.    Plaintiff responded to the following Interrogatory:

"2.   Identify all documents in your possession, custody or control **_which support your claims in this litigation_**, including the name of the record custodian of each document, the location of each document, and a general description of each document."

"Response:    Contracts regarding work secured by Plaintiff on Defendant's behalf; contemporaneous handwritten notes and emails regarding Defendant's conduct during Plaintiff's employment with Defendant; job descriptions from Gil Neuman, **_Offer letter from Gil Neuman_**; notesbooks regarding employment with Defendant........"

you contained sales quotas or what you construed to be a bonus opportunity, but would you agree with me that –I'm going to show you again Defendants Number 5– that in no month prior to February, 2007 had you or your team ever met the numbers that are contained in that email ?

MR. CELLER: Object to form

A.      I would disagree.

Q.      Tell me why

A       I have my notes and we hit it in the month of December.  We hit over 801,000 and some change.
.......

Q.      ***So did you in any month between the time you were hired and the time you had this meeting in mid February–had you ever met those goals–you and your sales team ?***

MR. CELLER:   Object to form.

A.      ***We made the $800,000 per month of security service and through our working document with Gil we weren't supposed to focus on FISI.*** ....

[E. Greenfield Depo, pp. 177-178].  Plaintiff would be hard-pressed to argue with candor to this Court that a difference between what she now claims was her quota of $5 Million/year is just a "minor change" from the $1.05 Million in new business her sales team was supposed to generate each month.  Nor can Plaintiff in response to a Motion for Summary Judgment now contradict her previous sworn testimony, sworn discovery responses (and the previous position of her counsel) that these exhibits defined ***her*** and her employer's expectations for performance. [14]

---

[14]  Plaintiff's previous position was that she did not meet her sale goals because: 1) she was stuck with the sales staff who were already in place when she was hired; [G. Neuman Depo, p. 121];  two of the sales staff (including one she hired) were found to have used drugs [Id]; and others she hired did not turn out [Id, p. 122:10-11]; and Mr. Neuman told her not to write contracts [G. Neuman Depo, pp. 62-63 ]   She now adds a fourth excuse: she was subject to the whim of customers. ¶ 4, E. Greenfield

Plaintiff cites Brockman v. Avaya, Inc., 545 F. Supp. 2d 1248 (M.D. Fla. 2008) for the proposition that her prior industry experience and 5 months in the position entitle her to an inference she was qualified.  Unlike the plaintiff in Brockman, *supra*,  Plaintiff did not have "years of experience" in the security industry prior to her employment with Defendant. See also Lassiter v. Neurological Surgeons, P.C., *supra* [plaintiff qualified because she had 15 years medical billing experience].  Plaintiff's one year of managerial sales experience at ISS was in the sale of ***security hardware***, not security services [E. Greenfield Depo, p. 26:3 ] which she now claims Mr. Neuman de-emphasized.   Second, Plaintiff was ***unsuccessful as a sales manager at ISS*** and suffered a pay cut because of her lack of performance.   The plaintiff in Brockman also had worked at Avaya for a year prior to her promotion whereas Plaintiff was new to KSS .  In Brockman, the plaintiff held her promotion for a period twice as long as Plaintiff, raising the presumption that if she was not competent she would have been terminated sooner.   Here Plaintiff was demoted after being given a five month window to prove herself.   And, unlike the plaintiff in Brockman who was terminated three weeks after the announcement of her pregnancy, the decision to demote Plaintiff was made ***three months after*** she announced her pregnancy.

      For these reasons, Plaintiff cannot establish that she was "qualified" for her position because she lacked prior successful experience as a sales manager and did not meet the acknowledged sales quotas that were expected of her.[15]

---

Declaration.

   [15]   Even if Plaintiff's position that Mr. Neuman told her not to worry about meeting the $250,000 monthly sales quota for FISI were taken as true, she still would not have met the $800,000 monthly sales quota for security services or been near target to meet it.   $800,000 x 12 months = $9,600,000.

"Similarly Situated"

Plaintiff's response takes a contradictory position on this point: she had no comparators yet, she then offers Todd Schwartz, former President of KSS and Patrick Hurley, a former President of KSN to establish that males were treated more favorably than she. [16]   To make that comparison, she must show that Mr. Schwartz and Mr. Hurley's positions were "nearly identical" in "every relevant aspect."  See Wilson v. B/E Aerospace, Inc., 376 F. 3d 1079 (11th Cir. 2004).   She cannot.

Mr. Schwartz was President of KSS.   ***Part of his duties*** at a time were to oversee the sales team.   See Declaration of Todd Schwartz, ¶ 3 ("...my compensation was based ***in part*** ...) [Emphasis Supplied].  Mr. Hurley originally held the title of Vice-President Sales for KPB and then was named  President of KSN.  [See Second Declaration of G. Neuman, attached as Exhibit 1]. As presidents, Mr. Schwartz and Mr. Hurley's overall job performance was measured by: 1) growth of their respective companies; 2) retention of clients and 3) measured improvement in the cost of goods sold. [See Exhibit 8, email from G. Neuman to P. Hurley dated 8/9/05 re: "new comp plan." describing factors on which Hurley's performance would be measured].

Plaintiff's performance, on the other hand, was measured on her success in

---

[16]  To the extent that Plaintiff uses Mr. Hurley as a comparator  it is appropriate for Defendant to show that Mr. Hurley also claimed he was a victim of ***gender*** discrimination. [See sworn EEOC charge attached to Second Declaration of G. Neuman].   Plaintiff and Mr. Hurley reported to the same supervisor, Mr. Neuman. Mr. Hurley similarly complained that Mr. Neuman ***ignored***,  ***"targeted"*** and ***singled him out for "mistreatment***." [Id.].   Mr. Hurley alleged to the EEOC that he, too, "***met and even exceeded***" the company's reasonable performance expectations.   Thus, a male and female were treated to the same "difficult management style that creates workplace stress."

"building, motivating and training" a sales team **_and_** achieving $1.05 Million/new sales a

month.    Plaintiff has offered no proof that Mr. Schwartz or Mr. Hurley's sole tasks were

"building, motivating and training" a sales team and meeting monthly sales quotas.  In fact,

when Mr. Hurley held the title of Vice President, Sales, he was the **_only_** person selling.

[See Second Declaration of G. Neuman, Exhibit 1]. [17]

Plaintiff also attempts to compare herself to salespersons [18] who were not

"reprimanded" for failing to meet **_annual_** sales goals.   This fails for two reasons: one,

Plaintiff's sales quota was set on a monthly not a annual basis and two, Plaintiff--a

supervisor-- cannot compare herself to individuals who held subordinate positions.  See

Mathis v. Wachovia Bank,  255 Fed. Appx. 425 (11th Cir. 2007).

Plaintiff's true comparators are Brandy Callahan and the other women who were

employed by KSS or its related companies who became pregnant during their employment,

took maternity leave and then returned to work.   Ms. Callahan was pregnant and attended

the same retreat where Plaintiff announced her pregnancy.  Ms. Callahan's declaration,

Exhibit  4, establishes that she found Mr. Neuman was very accommodating during the

retreat and also when she gave birth prematurely.    Her promotion to the managerial

_____

[17]    Even assuming there was a similarity between Plaintiff's performance
standards and Mr. Schwartz and Mr. Hurley's performance standard, it would not matter
in terms of this case.   Nix v. WLCY Radio/Rahall,  738 F.2d 1181 (11th Cir. 1984.  "If an
employer applies a rule differently to people it believes are differently situated, no
discriminatory intent has been shown".  Mr. Neuman clearly viewed the goals and
expectations for the positions of President differently than Vice President, Sales.

[18]  Plaintiff was supervised by Mr. Neuman.   The sales team in 2005-06 was
supervised by Mr. Schwartz.    Differences in treatment by different supervisors or
decision makers can seldom be the basis for a viable claim of discrimination.  Jones v.
Gerwens, 874 F.2d 1534, 1541 (11th Cir. 1989))

position of Operations Director ***the day she returned from leave*** in late February, 2007 demonstrates to  female employees of KSS and KSN that becoming pregnant and taking leave are not discouraged.  Ms. Callahan's promotion–in the same time frame as Plaintiff's demotion– dispels any inference that pregnancy was a factor in Mr. Neuman's decision.

<u>Defendant's Legitimate Business Reasons for Plaintiff's Demotion</u>

Plaintiff attempts to dispute Defendant's legitimate business reason for her demotion by now claiming her sales quota of $5 million in sales annually rather than $1.05 million is sales monthly.   However, this is really an argument about pretext.   What Plaintiff "***does not dispute"*** is "***what Mr. Neuman expected in his mind***' . See Statement of Disputed Facts, ¶ 9.   What ***was*** in Mr. Neuman's mind was a reasonably expectation Plaintiff was to produce $1.05 Million in new sales a month [G. Neuman Depo, pp 382-383]; that she did not know what she was doing; [Id., pp. 56-57]  that Plaintiff's high salary was not justified [Id, pp. 383-383] because most of the sales during Plaintiff's tenure were produced by Teri Reale who already had established herself as an experienced and highly successful salesperson prior to Plaintiff's tenure [Id pp. 57,61;  Exhibit 1, 2d Declaration of G. Neuman and Teri Reale Sales chart]; that he had been told by others in management that Plaintiff did not know what she was doing or her actions were affecting sales [Id. pp. 370, 377-378, 383]; and that Plaintiff was not dedicating her full time and attention to her position.  [Tab 1, Appendix to Summary Judgment, Declaration of G. Neuman; G. Neuman Depo, p. 270]. That Mr. Neuman's expectation may have been different than Plaintiff's does not negate his belief that Plaintiff was incompetent and not performing up to ***his*** expectations. <u>Jones v. Gerwens,</u> *supra.*  What Mr. Neuman "expected in his mind" is as legitimate as any other

reason. Chapman v. AI Transport, 229 F.3d 1012, 1030, 1033 (11th Cir. 2000) (en banc).

Elrod v. Sears, Roebuck & Co., 939 F.2d 1466 (11th Cir. 1991). Plaintiff has produced no

evidence to contradict that Mr. Neuman's beliefs and expectations were not reasonable.

So long as the reasons an employer provides are plausible, a court will not second-guess

the employer's decision. Elrod v. Sears, Roebuck & Co., *supra*.

Pretext

A plaintiff may not establish that an employer's proffered reasons are pretextual

merely by questioning the wisdom of the reason, at least not where the reason is one that

might motivate a reasonable employer. Combs v. Plantation Patterns, 106 F.3d 1519, 1538

(11th Cir. 1997). Once an employer has met its burden to articulate reasons for adverse

action, a plaintiff must show with ***specificity*** that the employer's explanation is a lie and

that discrimination is the real reason. Silvera v. Orange County School Board, 244 F. 3d

1253 (11th Cir. 2001); Chapman v. AI. Transport, *supra*. See also Nix v. WLCY

Radio/Rahall, 738 F.2d 1181 (11th Cir. 1984)[ "...a simple finding that the defendant did not

truly rely on its proffered reason, without a further finding that the defendant relied instead

on [a protected category], will not suffice to establish Title VII liability."]

Plaintiff has not shown that Defendant's reasons for her demotion are false or that

Mr. Neuman's beliefs were not reasonably held. See, e.g. Rosales v. Keyes Company,

2007 U.S. Dist. LEXIS 3 (S.D.Fla. 2007)[citing Elrod v. Sears, Roebuck & Co., *supra*. [19]

---

[19]  Mr. Neuman's belief that Plaintiff was incompetent was influenced (besides her failure to meet sales quotas) by other managers who had gave him negative feedback about Plaintiff.  While Plaintiff attempts to deny the circumstances of each incident, see E. Greenfield Declaration ¶ 49, she has no evidence to the contrary that Mr. Neuman was aware of and considered these incidents in his decision-making. Even Mr. Hurley does not deny the statement in Mr. Neuman's declaration that he

She has not shown that Defendant has given ***conflicting statements*** to explain her demotion which might call into question the validity of the legitimate business reasons stated. Id. Plaintiff has not tendered one shred of evidence, save her self-serving after-the-fact declaration, to establish that there was ever a change in her expected sales quotas. [20] The rest of her case for pretext is "mud thrown on the wall" consisting of "kibbitzing", stray comments by non-decision-makers, rampant hearsay, un-identical comparators, and opinions as to her qualifications. Importantly, she does not dispute that her sales team only exceeded $800,000 in sales once [21] and that there is no temporal proximity to the announcement of her pregnancy and her demotion.

Nor has Plaintiff shown that Mr. Neuman harbored animus towards pregnant employees or women as a class. Indeed, she could not. Evidence submitted by Defendant shows that a supervisory employee named Brandy Callahan who was pregnant at the same time as Plaintiff, left on a three month maternity leave and the day she returned

---

complained early and often about Plaintiff's abilities. To the extent that Plaintiff relies on Rosales for the proposition that she can evade summary judgment by mere denials on non-performance, she is estopped having admitted at deposition her sales team's failure achieve even $800,000 in new sales except for one time.

[20] Given she just had suffered a salary decrease at ISS for failure to produce adequate sales, Plaintiff surely would have documented something as important as an understanding at KSS of the expected sales quotas. The only documents Plaintiff has produced to show the terms and conditions of her employment are the August 26, 2006 emails exchanged with Mr. Neuman. Further, Plaintiff made sure to document occurrences at work either in her spiral notebook or in her private notes. She has not produced a single document to support her suddenly changed position that all she was expected to produce was $5 Million in new sales yearly.

[21] As previously noted, Mr. Cardiff had worked on the $400,000 sale to the Charter Club (which consisted one half of that amount) before Plaintiff became involved.

was promoted by Mr. Neuman into a managerial position.    Ms. Callahan's declaration, attached as Exhibit 4, shows that Mr. Neuman–at the same retreat attended by Plaintiff– continually expressed his concern for her comfort since she was 7 months pregnant at the time.   Evidence also has been tendered that other women employed by KSS or is related companies at every level have become pregnant, taken leave and returned to their positions.   Daugherty v. Mikart, Inc., 2006 U.S. Fed. LEXIS 31472  (11th Cir. 2006) [history of treatment of other employees in protected class must be overcome to show pretext]. Both Ms. Callahan and Ms. Franklin's declarations, Exhibits 4 and 5, bolster Defendant's proof that Mr. Neuman bore no animus toward women.

Instead, Plaintiff bases pretext on the splatter of uncorroborated remarks–many of which are hearsay, allegations of hostility toward her (without tying such hostility specifically to her pregnancy) and speculation.   However, none of the purported remarks made by ***the decision-maker*** Mr. Neuman relate to her demotion. See Ash v. Tyson Foods , Inc.  2006 U.S. App. LEXIS 19750 (11thCir. 2006), following remand [ no showing that use of the word "boy" uttered in context of decisions at issue].   Plaintiff does not even tie Mr. Neuman's alleged remarks to her work performance (i.e., "you're not selling enough because you're pregnant') or competency ("i.e., pregnant women are incompetent.").  Plaintiff's speculation that Mr. Neuman was angry because she was pregnant and KSS would lose revenue while she was out taking maternity leave is not evidence of pretext. See Lassiter v. Neurological Surgeons, P.C., *supra* [speculation does not constitute evidence of pretext].   She cites no evidence to support this theory nor does it even make sense.   Under Plaintiff's own version of events, she would have taken little time off after giving birth.    Assuming Plaintiff had

been performing her duties competently by the time she was due to give birth, her short absence would have had little effect on a trained and motivated sales team.

<u>Constructive Discharge and Retaliation</u>

Plaintiff's retaliation and constructive discharge claims are contrived.   She heavily relies on rank hearsay (out of court statements by Leyda Tollentino) and statements admittedly made in Hebrew, a language she does not speak fluently (that of Orly Alexander).   She ignores evidence that her counseling by Ms. Alexander for being out of the office was a result of ***<u>a co-employee complaint about not being able to get ahold of her</u>***   [Plaintiff's Appendix, Ex. D, Notes from 4/12/07] and that every other corporate employee also was warned about keeping business hours.  [See, Tab 19 Defendant's Appendix to Summary Judgment, Memo dated 4/5/07 issued to all employees re attendance].  [22]   Plaintiff  takes offense to trivialities (such as having to punch a time card, having her pay broken down to an hourly rate and being excluded from two meetings); objects to having Rose Cucurillo being used as a buffer between she and Mr. Neuman ***<u>after complaining that he was harassing her</u>*** ; and, simply ignores documentary evidence that refutes her premise that Mr. Neuman did not respond to her email, [Tab 16, Defendant's Appendix to Summary Judgment] or that the reason he did not respond to some was that he was on a family vacation when she sent them.  [23]  Her complaint that she was not permitted to assist others with work is belied by her own notes.  [See Plaintiff's

---

[22]  This occurred three days before her complaint of pregnancy discrimination.

[23]  Plaintiff also acknowledged that even before she announced her pregnancy, Mr. Neuman did not respond to some of her email,   [E. Greenfield Depo, pp. 80, 95] and that one of the things she and Lynette Janac, a newly hired female member of management, wished to change was the "total lack of communications." [Id, p. 106].

Appendix, Exhibit D, Notes from 4/12/07].

Plaintiff shows a complete lack of candor with this Court about the timing of her change in pay rate.   She does not refute that she was paid through April 1, 2007 at the salary rate of Vice President, Sales or that her first pay date following her demotion was 4/18/07.   Thus her new pay rate had to have been implemented at least two weeks before on 4/5/07– three days *__before__* her 4/8/09 email to Mr. Neuman complaining of pregnancy discrimination. [G. Neuman Depo. p. 305].   This destroys the inference she attempts to raise that there is a causal connection between her lowered salary and her 4/08/07 email to Mr. Neuman. [24]

Here, there is no evidence that Plaintiff was cut-off from all contact with other workers; given an increased work load or no work whatsoever; assigned work that she did not know how to perform; had her computer access cut off purposefully; was excluded from important meetings [25]; was badgered constantly; was left in a position to continue to be harassed;[26] or threatened with the loss of her job.   That she did not feel "fulfilled" in her new position or was disappointed with her new assignment and considered it a step down,

---

[24]   As with her new position that she was only required to produce $5 Million in new sales annually, so does Plaintiff claim that she early and frequently complained to Mr. Hartley and Ms. Tollentino.   Even assuming this were true, she has no evidence to show that Mr. Hartley or Ms. Tollentino communicated these complaints to Mr. Neuman. [E. Greenfield Depo, p. 191].

[25]   See Thomas v. Schafer, 2008 U.S. Dist. LEXIS 46653 (M.D. Ala. 2008) [no reasonable employee would resign due to exclusion from two meetings ].

[26]   Plaintiff argues that she should be considered constructively discharged because no investigation was completed.   She does not contest, however, that Mr. Neuman removed himself from her direct supervision soon after he received her complaint.  Thus a form of remedial action was instituted to protect her from continued perceived harassment. [G. Neuman Depo, p. 232].

and was upset with decreased pay are not the type of circumstances that support a constructive discharge.[27]   The test is objective and does not consider an employee's subjective reaction to the working conditions.  Walton v. Johnson & Johnson Servs. Inc., 347 F.3d 1272, 1282 (11th Cir. 2003). The threshold for establishing constructive discharge is "quite high" and requires "pervasive conduct by [the] employer." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001).

Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant work conditions are not so intolerable as to compel a reasonable person to resign. See, Thomas v. Schafer, supra ["Looking at the totality of the circumstances, the court does not doubt that Thomas was unhappy with her job. However, the court also does not doubt that a reasonable person in Thomas's situation would not have felt compelled to quit.  Indeed, Thomas's claims are almost textbook examples of the subjective complaints related to allegations of humiliation, unfair criticism,  marginalization, and displeasure with working conditions that are insufficient to constitute a claim for constructive discharge."]

Finally, Plaintiff has not provided any evidence to establish that Defendant's actions on or after 4/9/07 were causally connected to her internal or external complaints of discrimination or that Defendant's intent was to make her quit – other than through her own speculation and inadmissible statements.

In sum, there is no direct evidence of discrimination or retaliation in this case which consigns Plaintiff to prove her case by circumstantial evidence.   Plaintiff cannot establish

---

[27]  Defendant submits that loss of a company car also would not be circumstances that would impel a reasonable work to quit, especially when Plaintiff was not given a deadline to turn in her vehicle and was offered rides home by co-workers.

a prima facie case of pregnancy discrimination or retaliation through the McDonnell-Douglas paradigm as a matter of law because she was not qualified for the position of Vice President Sales.   Even if she could, she still cannot and did not meet her burden to come forward with ***admissible*** evidence of pretext to rebut Defendant's stated reasons for her demotion and the incidents that were attendant to her demotion such as the loss of pay and benefits.

Lastly, the Court should not condone Plaintiff's "win-at-all costs" attempt to avoid summary judgment by introducing and relying on rank hearsay, purported comments made in Hebrew, self-serving statements and the opinion of others, and the most flagrant of all, by taking a factual position wholly different than her sworn testimony and discovery responses.   For these reasons, Defendant is entitled to summary judgment.

Respectfully Submitted,

LANGBEIN & LANGBEIN, P.A.
Counsel for the Defendant
8181 NW 154th Street, Suite 105
Miami Lakes, FL 33016
Tel: (305) 556-3663
Fax: (305) 556-3647
Email: langbeinpa@bellsouth.net

By:    /s/ Leslie W. Langbein
        Leslie W. Langbein, Esq.
        Fla. Bar No. 305391

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was filed electronically on June 8, 2009 through EM/ECF and that a copy of the foregoing will be served via notification through EM/ECF on all counsel or parties of record on the attached service list:


By:   *Leslie W. Langbein,*
            Leslie W. Langbein, Esq.
            Fla. Bar No. 305391

<u>SERVICE LIST</u>
CASE NO 08-22033-CIV-ALTONAGA/BROWN

MORGAN & MORGAN, P.A.
6824Griffin Road
Davie, FL   33314.
Tel: (954) 318-0268
Fax: (954) 333-3515
email: Richard@cellerlegal.com
Counsel for the Plaintiff