# EXHIBIT 1.

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO: 08-22033-CIV-ALTONAGA/BROWN

ELLEN GREENFIELD,

    Plaintiff,

vs.

KENT SECURITY SERVICES,

    Defendant.
_____

DEPOSITION OF

GIL NEUMAN

TAKEN ON BEHALF OF THE PLAINTIFF

Wednesday, December 17, 2008
9:18 a.m. - 11:29 a.m.

Brown & Gallo
515 East Las Olas Boulevard
Fort Lauderdale, Florida

Chloe Leroux, FPR



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

1   A.   Yes.
2   Q.   And you were the person who made the decision
3   to demote her, correct?
4   A.   Yes.
5       MS. LANGBEIN: I'm going to object to the
6       leading form of the questions.
7   Q.   And you were the person who made the decision
8   to put her in a marketing position, correct?
9       MS. LANGBEIN: Objection to form.
10  A.   Yes.
11  Q.   And you were the person who made the decision
12  to put her in the position of corporate communication
13  specialist?
14      MS. LANGBEIN: Objection to form.
15  Q.   Correct?
16  A.   Those last two questions you asked were at the
17  same time.
18  Q.   Okay, but you made the decision as to both of
19  them, correct?
20  A.   Yes.
21      MR. CELLER: Leslie, if you want to put a
22      standing objection on the record, I'm fine with it,
23      saying that I'm leading. I have no objection to
24      that.
25      MS. LANGBEIN: I think I'll put the objection



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

54

1  Q. Were you satisfied with the sales team at the
2  time Mrs. Greenfield took over her employment?
3  A. Absolutely not. That's why I hired a sales
4  manager.
5  Q. Do you believe that as a sales manager, she
6  should have been given an opportunity to create a sales
7  team within a reasonable amount of time?
8  A. Absolutely.
9  Q. Would you agree that during the period of time
10  that she was building a sales team, that her
11  productivity or the production numbers would be lower
12  until she got her team in place?
13  A. Yes.
14  Q. So how long do you believe it should have
15  taken her to find the right people and to start getting
16  the numbers to where you wanted them to be for sales?
17  A. It's a loaded question, because you can say
18  that a good salesman would take a year to sell. You can
19  say a good salesman would take him 8 months. However,
20  when you deal with sales people, you know right off the
21  bat based on their daily production of leads, based on
22  their daily production of proposals, based on many, many
23  things.
24  And very early on, I realized that Ellen,
25  being the nice person that she is, she was way in over



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

1  her head.

2      Q.  Can you give examples?

3      A.  She asked for me to help her in, where do we
4  advertise for people? Sit in interviews. She asked us
5  to help her with offer letters. Where we thought that
6  we were getting somebody who would take all that, we
7  realized that it's new to her.

8      Q.  You were aware of that prior to the time you
9  hired her, correct?

10     A.  No.

11     Q.  You knew at the time you hired Ms. Greenfield
12 that she had no experience in the security industry,
13 didn't you?

14         MS. LANGBEIN: Objection to form.

15     A.  Absolutely not true.

16     Q.  What is your understanding as to what
17 experience she had in the security industry?

18     A.  ISS is a security company.

19     Q.  Is ISS a competitor?

20     A.  Yes.

21     Q.  What was her job with ISS?

22     A.  Head of sales.

23     Q.  Do you know what sort of sales numbers she had
24 at ISS?

25     A.  She told me that she sold millions, I think



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

56

1  she mentioned 3 or $4 million in one year.
2       Q.   How much did she sell for Kent Security during
3  the time period that she was vice president of sales
4  position?
5       A.   Personally?
6       Q.   Her team.
7       A.   Her team that she built, one account, two
8  accounts.
9       Q.   One or two accounts?
10      A.   Yes.
11      Q.   This was with the team you provided her with
12  to start, correct?
13           MS. LANGBEIN: Objection to form.
14      A.   If my memory serves me right, I think Ellen
15  fired the one or two people that were there before her
16  in the first month and then worked towards building her
17  own team.
18      Q.   At what point, in your opinion, was
19  Ms. Greenfield, I think you used the word "incompetent"
20  during your prior deposition, do you remember that?
21      A.   It's possible.
22      Q.   At what point did you believe that
23  Ms. Greenfield was incompetent, to use your word?
24      A.   Every day that went by and I realized that
25  she's not showing leadership on her, quote/unquote, team



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

57

1  and job responsibility, I realized that I made the wrong
2  decision.
3      Q.  Yet you kept her on in that position for how
4  many months?
5      A.  About 5 months.
6      Q.  She started in approximately September?
7      A.  Right.
8      Q.  And she was demoted in approximately March of
9  '07, correct?
10     A.  Yes, but we discussed, I had many meetings
11 with Ellen, and I said, this is not working out.
12     Q.  Is there any documents you would have to
13 identify when those meetings took place?
14     A.  I can go and look at my calendar, but it was
15 not a big surprise.  We had those meetings, and we said,
16 what are we going to do, because we are not making any
17 progress?
18         We had one sales lady by the name of Teri
19 Reale that was there for years and years before Ellen
20 joined us, and she's still there today, and she was
21 carrying Ellen on her back.
22     Q.  My question to you, was there any documents
23 that you're aware of that would indicate when these
24 meetings with Ellen took place?
25         MS. LANGBEIN:  He said he would have to check



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

1  question to you is, your position is that Ms. Greenfield
2  was not performing her job properly or up to your
3  standards?
4     A.  That's true.
5     Q.  I need you to identify for me what documents
6  would support your position.
7     A.  The lack of documents, in other words, the
8  lack of contracts being produced, the lack of work being
9  produced.
10    Q.  So is it your position that there are no
11 documents that would support your position that
12 Ms. Greenfield was not performing properly?
13         MS. LANGBEIN:  Objection to form.
14    A.  I'm telling you that if Ms. Greenfield would
15 have done her job, she would have a lot to show for it.
16    Q.  What would there be to show for it?
17    A.  A team, the production of the team, members of
18 the team, signed contracts with new customers that the
19 team has brought.
20         The only thing that was done for the company
21 at the time that Ms. Greenfield worked was the
22 production of Teri, and Teri was there 2 years before.
23 We did not hire Ellen to build on Teri's back.
24    Q.  Let me ask you, during the time period
25 Ms. Greenfield was in the position of vice president of



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

62

1  sales, did you ever advise her to delay writing
2  contracts because the defendant did not have the
3  appropriate staffing to provide for those contracts?
4      A.  I don't think I ever asked anybody to delay a
5  contract.
6      Q.  As you sit here today, is your testimony
7  certain that you never told Ms. Greenfield to defer or
8  delay writing contracts because you weren't able to
9  sufficiently staff them with security personnel?
10     A.  In the 26 years of our business, we have never
11 deferred writing contracts.
12     Q.  How certain of that are you as you sit here
13 today?
14     A.  100 percent.
15     Q.  Let me ask you this.  Are you as certain of
16 the fact that you never told Ms. Greenfield to do that,
17 meaning to defer contracts, as you are of the fact that
18 you didn't discriminated against her?
19         MS. LANGBEIN:  Objection to form.  That's a
20 harassing question.
21         MR. CELLER:  No, it's not a harassing
22 question.
23         MS. LANGBEIN:  Yes.  It is like asking, when
24 did you beat your wife?
25

ESQUIRE

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

Gil Neuman

December 17, 2008

63

BY MR. CELLER:

Q. Let me clarify. You're certain you didn't discriminate against Ms. Greenfield, correct?

A. That's correct.

Q. You're also certain that you never told her to defer writing contracts or delay them because Kent Security didn't have the ability to staff them with security personnel, correct?

A. Again, I do not remember ever in the 26 years of Kent history that we did not want to take no business.

Q. Are you as certain that you never told her that as you are that you didn't discriminate against her?

MS. LANGBEIN: Same objection.

A. You're asking about two different issues not related and you're asking me to make a correlation.

Q. Are you 100 percent certain you never discriminated against Ellen Greenfield?

MS. LANGBEIN: Asked and answered.

A. Yes.

Q. Are you 100 percent certain you never told Ms. Greenfield to delay writing contracts?

A. Yes.

Q. Fair enough. We got it. We just got it a



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

74

1  Q.  You don't know one way or another as we sit
2  here?
3  A.  This is what I gave Ellen is what I expect
4  from her.
5  Q.  You're referring to Exhibit No. 2?
6  A.  That's correct.
7  Q.  But would you agree, are Exhibits 1, 6, and 2
8  consistent when you read them all together, with your
9  understanding as to what Ms. Greenfield would be paid,
10 what the expectations of her job were, and what her
11 benefits were?
12 A.  Yes.
13 Q.  Would you agree that if we took all three of
14 the documents that we're looking at, Exhibit 1, 6, and
15 2, that it would be fair for her to rely on what is
16 contained in here to know how much she was getting paid,
17 for example?
18 A.  Yes.
19 Q.  What the job expectations of her were?
20     MS. LANGBEIN:  Objection to form.
21 A.  Yes.
22 Q.  What her benefits would be?
23 A.  Yes.
24 Q.  How her commission would be calculated?
25 A.  Yes.


ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

1  Q.  So is it fair to say that if we take the three
2  of these documents and put them together, can we refer
3  to this as the employment offer package?  Is that a fair
4  characterization?
5  A.  Yes.
6  Q.  Nowhere in either Exhibit 1, 2, or 6, does it
7  mention that Ms. Greenfield will be working for any
8  entity other than Kent Security, correct?
9  A.  Not correct.
10     MS. LANGBEIN:  I think you and I agree that we
11     would call it the defendant.
12     MR. CELLER:  Let's call it defendant, okay.
13  Q.  It doesn't say on here that Ms. Greenfield
14  will be working for anybody other than the defendant?
15     THE WITNESS:  Remind me, how did we define the
16     defendant?
17     MS. LANGBEIN:  Kent Security Services, Inc.
18  A.  The Document No. 2 clearly states that she is
19  going to be working for Florida Integrated also.
20  Q.  Show me where the words "Florida Integrated"
21  are on this document.
22  A.  It clearly states in the goals, the team
23  goals, and it says, I read, in $250,000 per month of
24  integration.  Integration is only done by Florida
25  Integration.



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

                            121
1   sales team at the time that Mrs. Greenfield started
2   with Kent?
3        A    I think.
4        Q    Okay.
5        A    But I'm not a hundred percent?
6        Q    Do you know why he resigned?
7        A    The only reason to have anybody resign
8   from sales or terminated from sales is poor
9   performance.
10       Q    And so would you agree that even though
11  Mr. Rainero was there before Mrs. Greenfield took
12  over, he was still not able to sell?
13       A    Yes.
14       Q    So she inherited somebody who couldn't
15  sell to begin with?
16       A    Absolutely.
17       Q    What about Jill Shavelson?
18       A    Her best friend.
19       Q    Did Ellen hire her?
20       A    Yes.
21       Q    What happened to her?
22       A    The she could not -- I mean, she could not
23  sell, obviously that's why she's not there.  And
24  two, it says she failed a random drug test and
25  resigned.


ESQUIRE

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

```
 1    Q    Do you recall the drug test that was
 2  administered?
 3    A    No.
 4    Q    Now, Michael Torbeck was he there at the
 5  time that Mrs. Greenfield took over as sales
 6  manager?
 7    A    No.  But that's Jill's brother-in-law,
 8  that's her family.
 9    Q    Understood.  So he was terminated I see
10  here for low sales, correct?
11    A    Just like everybody else.
12    Q    Who terminated him?
13    A    I assume it was Ellen.
14    Q    As part of her job responsibilities in
15  building a sales team, would you agree that she was
16  responsible for assessing talent to make sure they
17  could sell or not?
18    A    Absolutely.
19    Q    And you would expect that if an employee
20  wasn't selling properly that she would fire them.
21    A    Absolutely.
22    Q    So in that aspect it appears here that she
23  seems to be coming in and cleaning house?
24    A    That's not true.  Because both Jill and
25  Michael she hired.
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

BY MR. CELLER:

Q    Okay.

A    Because when she made the complaint, I felt it was appropriate to bring Rose into the picture, and since she was working under me directly, to have Rose as a go-between so she doesn't feel that I harass her.

Q    That's such a good question. After her demotion, is it your testimony that Mrs. Greenfield now reported to you directly?

A    Mrs. Greenfield reported to me directly all the time.

Q    Even after her demotion?

A    Even after her demotion.

Q    Why would you want to have somebody reporting to you that you felt was incompetent after the demotion --

MS. LANGBEIN:  Objection to form.

THE WITNESS:  I felt she was incompetent for many months before. But he was reporting to me directly all long. When she made the complaint against me that I harass her, I felt it was only fair moving forward that there was another person in the middle so nothing is misunderstood and nothing is being taken out of



Toll Free: 877.495.0
Facsimile: 954.987.7

Suite 1
515 East Las Olas Boulev
Fort Lauderdale, FL 33
www.esquiresolutions.

```
 1            THE WITNESS:  Pregnancy has nothing to do
 2       with anything.
 3   BY MR. CELLER:
 4       Q    What about courtesy, what about
 5   professional courtesy?
 6            MS. LANGBEIN:  Objection to form.
 7            THE WITNESS:  What about professional
 8       courtesy?
 9            MS. LANGBEIN:  Asked and answered three
10       times.  He gives an answer, but you don't like
11       the answer, but he's given it an answer.
12   BY MR. CELLER:
13       Q    Do you think Mrs. Greenfield exercised
14   professionalism towards you; regardless of whether
15   you were satisfied with her performance, was she
16   professional?
17       A    No, I don't think so.
18       Q    Okay.  Why not?
19       A    Let's start over again.  I think the
20   person come to work who surf the net to buy gifts
21   for her husband, that's not professional.
22       Q    Do you ever do anything on company time
23   like make a personal phone call, Mr. Neuman?
24       A    I do not have a boss.
25       Q    Sure you do.  You are not an owner of the
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

1  been paid in her regular capacity as vice president
2  of sales.
3      A   That's correct.
4      Q   And then logically her next paycheck would
5  have been this one that she complained about,
6  correct?
7      A   Her next one?
8      Q   Her next paycheck would have been at this
9  lower rate?
10     A   Again, I don't have the calendar with the
11 dates.  But obviously if April 1 is the date she
12 should have continued to get paid the old rate until
13 April 1st and then --
14     Q   Her next --
15     A   -- after April 1st, it would change to the
16 new rate.
17     Q   Okay.  So if her first paycheck came
18 April 18th or around there, that would have been
19 whatever the rate is that you guys had a
20 disagreement on?
21     A   Yes.
22     Q   Okay.  Fair enough.  Was there a period of
23 time after her demotion that you took away some of
24 her job duties and responsibilities, after the
25 demotion where you said stop doing marketing or stop



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company