# EXHIBIT 9.

# In The Matter Of:

*Greenfield v.
Kent Security Services*

*Ellen Greenfield
February 12, 2009*

*Friedman, Lombardi & Olson
19 West Flagler Street, Suite 924
Miami, FL 33130
(305) 371-6677*

Original File 021209EG.txt
**Min-U-Script® with Word Index**

Greenfield v.
Kent Security Services

Greenfield
ry 12, 2009

Page 5

rried.
Q. Did you meet him in South Florida or
place else?
A. I met him on J Date.
Q. I understand you have a degree from the
iversity of Miami, undergraduate?
A. Yes.
Q. You also have a master's degree?
A. I have my master's. I didn't finish my
sertation.
Q. All but the dissertation?
A. Yes.
Q. So it's not technically a master's?
A. Right.
Q. During the time you were growing up did you
end any type of parochial schools?
A. No.
Q. Do you speak any languages besides English
ently?
A. Spanish.
Q. Did you have any education in Hebrew when
u were growing up?
A. Basic Sunday school and a little -- when
u had said parochial school -- basic -- I never had
Bar Mitzvah -- I'm sorry -- but my children will.

Page 6

Q. The reason I ask about parochial is in case
u had gone to a Hebrew high school.
A. No. I did not.
Q. Have you ever spent any time in Israel?
A. No.
Q. Do you have any relatives who speak Hebrew
ently?
A. You know, I'm not sure.
Q. Do you have any medical conditions, either
w or at any prior time in your life?
   MR. CELLER: Object to form.
   You can answer.
A. What type of medical conditions?
Q. Asthma, high blood pressure.
A. I do have asthma since I'm 16.
Q. Anything else?
A. I'm allergic to shellfish -- it's
portant, though -- and nuts. I could die.
   Those are medical conditions.
Q. For the asthma, is there anything that
gers the asthma?
A. Yeah. Anima's.
Q. I'd like to start with your work history.
   Did you go straight through college to go
ough your postgraduate course work?

Page 7

1  A. No. I actually stopped after my -- my
2  undergraduate degree.
3  Q. When did you receive that?
4  A. 1994.
5  Q. In 1994 after you received your degree did
6  you work?
7  A. Yes.
8  Q. Where did you work?
9  A. I started at John Casablancas Modeling.
10 Q. How long did you do that?
11 A. Maybe two, three months.
12 Q. Was this a modeling course you were taking?
13 A. No. I'm not a model. I went to go -- it
14 was a --
15 Q. It was a sales position?
16 A. It was a sales position, yes.
17 Q. You were trying to sign people up?
18 A. Talent scout.
19    I left there.
20 Q. You quit?
21 A. Yes, I did.
22 Q. Where did you go to next?
23 A. I then went to Zimmerman and Partners
24 Advertising.
25 Q. What was your position there?

Page 8

1  A. I was a media buyer.
2  Q. Where is Zimmerman located?
3  A. In Fort Lauderdale on Commercial Boulevard.
4  Q. After that did you leave there?
5  A. I left there and went back to school, and I
6  worked part-time when I went back to school.
7  Q. Where did you work part-time?
8  A. I worked at Neiman-Marcus.
9  Q. Was that the one that was located in
10 Broward County or in Dade County?
11 A. In Dade County, Bal Harbour.
12 Q. I guess we didn't kind of go over some of
13 the rules in the beginning, so let me just kind of
14 back up and tell you how I take a depo. You've been
15 sitting through some depos, so you know how Richard
16 takes them.
17    The one thing that's important to me is
18 that you give your attorney a chance to make any
19 objections because what I'm doing is I'm asking
20 questions and you're very quickly answering, so
21 relax, take a breath, give him an opportunity just to
22 pause for a second so if he has an objection to the
23 form of the question he can make it.
24    The other important thing is that we not
25 talk over one another, and some of my questions have

Page 17

1  Q. Do you know if they're still at the same
2  location?
3  A. They are.
4  Q. Do you know we tried to serve them to get
5  your employment records and the process server went
6  three times and no one was there?
7  A. Yes. Well, I don't know that, but I'm
8  saying you went to the 3651 FAU Boulevard?
9  Q. Correct.
10 A. Yes. It's still there. I think it's under
11 Transact now, or it might be under another company,
12 which I'm not sure of the name because in 200 -- it
13 was either 2005 or 2006 it was sold to Transact,
14 which is now based out of New Jersey.
15 Q. Do you stay in touch with Mr. Waldshan?
16 A. No.
17 Q. When is the last time you spoke with him?
18 A. Probably 2005.
19 Q. Now, you said that at some point your
20 compensation changed from being a straight commission
21 to a different arrangement.
22 A. Well, it changed in the fact that now they
23 gave us a so-called draw.
24 Q. What is the highest commission you earned
25 at Data Warehouse?

Page 18

1  MR. CELLER: Annual?
2  Q. Let me rephrase the question.
3  What's the best year you ever had at Data
4  Warehouse?
5  A. I think it was -- well, I know the best
6  monetary -- I don't know what year it was -- it was
7  267,000.
8  Q. That was one year.
9  Was that the last year you were there?
10 A. I'm not sure if it was the last year or the
11 year prior. It might have been the last year.
12 Q. Did you supervise anyone there?
13 A. Yes.
14 Q. Who did you supervise?
15 A. Her name was Kristen with a "K."
16 Q. Anyone else?
17 A. I trained the new people that came in.
18 Q. The new sales help?
19 A. When we would hire a new class (sic) we
20 would go training with everybody and it was kind of
21 like under my wing and then --
22 Q. Were you a sales manager?
23 A. No. I was a -- did I have the title? No.
24 Did I do the work? Yes.
25 Q. You said that this was a startup company

Page 19

1  when you first came to work there?
2  A. Yes.
3  Q. When you first came how many employees were
4  there?
5  A. I think there were 11 of us.
6  Q. How many of those were sales help?
7  A. Approximately five to seven.
8  Q. The rest were administrators?
9  A. Back end support.
10 Q. Now, at the time that you left how many
11 members of the sales force were there?
12 A. Approximately? 20 to 25 in one office.
13 Q. Was this like a call center where each
14 person had like a cubicle and a phone?
15 A. Yes. It wasn't a call center, but it was
16 set up like a call center, yes.
17 Q. Did you have any role in hiring the people
18 who worked for the sales office?
19 A. I would do interviews with them, but the
20 final choice was not mine -- the decision was not
21 mine.
22 Q. How did you come to leave Data Warehouse?
23 A. I left in September of '05. The company
24 was being sold. There were new things that were
25 going on and I wanted to explore other options.

Page 20

1  Q. Is that to say that when you resigned at
2  that point you didn't have another job?
3  A. At the moment I resigned I did not have
4  another job. I had another job within three weeks.
5  Q. Were there any reductions in force when the
6  company was bought by Transact?
7  A. Not when I was there.
8  Q. What about the company's changes made you
9  decide to quit?
10 A. When I started with the company the
11 mindset was that of a startup company. It was a
12 very exciting time to be there. There was a lot of
13 energy. It was a wonderful working environment and
14 when Transact -- when they started negotiations with
15 Transact things had started changing.
16 The company was not doing what it was
17 doing many years prior. The culture started to
18 change at the company. New commission structures
19 were being put in place, new terms. It was changing
20 for a corporate merge and it just didn't fit with
21 whom I was.
22 Q. It sounds to me like when you first started
23 working there it was a very informal atmosphere where
24 people were perhaps less formal and more friendly and
25 when the new company came in they made it more formal

Page 57

1  You might have a couple of different drafts
2  or something.
3  Q. That's what I want to see.
4  (Discussion off the record.)
5  MS. LANGBEIN: Let's take a five-minute
6  break.
7  (Short break.)
8  Q. I had sent your attorney an e-mail last
9  night asking you to bring with you your only spiral
10  binder today.
11  Did you bring that with you?
12  A. No.
13  MR. CELLER: We didn't speak last night.
14  I'm sorry. It's not something that I ignored. I
15  just didn't talk to Ellen.
16  If you want --
17  MS. LANGBEIN: I would like to see it, so
18  you'll have to produce it to me, the original.
19  THE WITNESS: Do you have it, because I
20  don't.
21  MR. CELLER: I have it on my desk.
22  THE WITNESS: I think I gave it to you.
23  I don't have it.
24  Q. I'm going to show you -- you mentioned that
25  Mr. Neuman had e-mailed you certain information and I

Page 58

1  think these had already been made exhibits to
2  Mr. Neuman's deposition.
3  Let me show you what has marked previously
4  in his deposition, but we'll mark as Defendant's
5  Number 4 in this deposition, an e-mail, which is
6  addressed to you dated August 26th.
7  Does that refresh your recollection that
8  you had negotiations with Mr. Neuman prior to the
9  time you left ISS?
10  (Whereupon, the document referred to was
11  marked Defendant's Exhibit No. 4 for Identification.)
12  A. Could be, yes, if that's what the date is,
13  then yes.
14  Q. Was that the e-mail that you were referring
15  to where there were some discussions going on about
16  terms of an offer?
17  MR. CELLER: Object to form.
18  You can answer.
19  A. I don't remember.
20  Q. Do you recall receiving that e-mail?
21  A. Yes.
22  Q. Did you respond to him via e-mail?
23  A. I don't recall if I phoned him or I
24  e-mailed back.
25  MR. CELLER: Are we marking that?

Page 59

1  MS. LANGBEIN: It's already been marked as
2  Defendant's Number 4.
3  Q. You recognize this as being the actual
4  formal offer that was made to you. Correct?
5  MR. CELLER: Object to form.
6  That was, I think, one of the offers that
7  was made to me.
8  Q. Was there another e-mail offer that was
9  different than this?
10  A. To my recollection there were a few offers
11  that were different.
12  Q. Was this the one, Defendant's Number 4,
13  that you actually accepted?
14  MR. CELLER: Object to form.
15  A. I don't know.
16  Q. Let me show you what we're going to mark as
17  Defendant's Number 5.
18  MR. CELLER: Are you doing stickers?
19  (Discussion off the record.)
20  Q. I'm showing you what we're going to mark as
21  Defendant's Number 5, and it appears to be a letter,
22  but we established at Mr. Neuman's deposition that
23  this is simply a reprint of a prior e-mail to you.
24  (Whereupon, the document referred to was
25  marked Defendant's Exhibit No. 5 for Identification.)

Page 60

1  Q. Do you recognize that document?
2  A. Yes.
3  Q. Now, was this a document that you received
4  prior to Number 4 or after Number 4?
5  A. I'm not sure, because this one isn't dated.
6  Q. Do you have any recollection of responding
7  to this e-mail -- to Defendant's Number 5?
8  A. Yes.
9  Q. Did you keep a copy of your response?
10  A. I don't know, because I'm not sure if I did
11  it on the phone or I did it via e-mail.
12  Q. You know that I have served you with two
13  requests for production, so in response to those you
14  would have looked for documents such as those
15  e-mails. Correct?
16  A. Yes.
17  Q. So if they existed you would have produced
18  them to me?
19  A. Yes.
20  Q. So is there anything as far as Defendant's
21  Number 4 and Defendant's Number 5 that you believe
22  did not become a term and condition of your
23  employment?
24  MR. CELLER: Object to form.
25  A. I think there might have been some minor

Ellen Greenfield  
February 12, 2009  

Greenfield v.  
Kent Security Services  

Page 61

1 changes.
2 Q. Do you recall what they were?
3 A. No.
4 Q. You understood when you accepted the job at
5 Kent that there were going to be quotas or goals that
6 had to be met each month?
7     MR. CELLER: Object to form.
8 A. May I go back to one other thing here?
9 Q. First answer my question and then we'll go
10 back.
11 A. So please repeat.
12 Q. Did you understand when you accepted the
13 position with Kent that there were going to be
14 monthly sales goals or quotas that had to be met?
15     MR. CELLER: Object to form.
16 A. There were incentives or bonuses the way
17 Gil and I discussed it.
18 Q. So you didn't recognize them to be things
19 that had to be met each month?
20 A. My job duties were that I was to build a
21 sales team and then bonuses or incentives could be
22 earned if we would hit certain numbers. If I hit
23 another part of a number I would get a partial bonus.
24 Q. Was there ever a document that you saw that
25 had a scale on it, such as that if you make this

Page 62

1 number, you'll get this percent. If you go to the
2 next number, you get a greater percent?
3 A. No.
4 Q. You were going to go back and tell me
5 something else.
6     By the way, if you have testified about
7 anything else that you couldn't recall or you think
8 is wrong and if you suddenly recollect differently,
9 you are welcome to correct the record at any point.
10 A. All right.
11 Q. So what are you going to tell me now?
12 A. You asked me if anything was changed in the
13 letter, and yes. I received medical coverage at the
14 beginning of the employment and they paid
15 100 percent.
16 Q. You're looking at Defendant's Number 4?
17 A. Number 4.
18     I do not receive a monthly auto allowance.
19 I'm just looking at the two.
20     MR. CELLER: Just for the record, referring
21 back and forth to 4 and 5.
22 A. The commission structure was changed, as
23 well.
4 Q. How do you recall the commission structure
25 being changed?

Page 63

1 A. Well, it states here in document number 5
2 that the commissions are paid monthly after they are
3 paid, and that did not hold true for me. It did hold
4 true for my staff, but it did not hold true for me.
5 Q. What was different about the arrangement
6 you had with Mr. Neuman as to how you would be paid?
7 A. There was no arrangement. He just made the
8 rules up as we went along.
9 Q. So are you saying that originally he had
10 represented to you that you would be paid monthly,
11 but it didn't turn out that way?
12 A. Yes.
13 Q. Anything else that changed between the
14 prior negotiations and what ultimately was a job
15 condition --
16     MR. CELLER: Object to form.
17 Q. -- or term and condition?
18     MR. CELLER: Object to form.
19 A. Could you repeat it one more time, because
20 I was thinking and I want to make sure --
21     (The question referred to was read by the
22 reporter as above recorded)
23     MR. CELLER: Same objection as to condition
24 or term and condition.
25 A. Yes. It was a working document and this

Page 64

1 changed each month basically.
2 Q. So there were a couple of these counts
3 going back and forth and as you and Mr. Neuman would
4 negotiate the terms would change?
5 A. It was verbal. There were no e-mail
6 documents going back and forth. It was verbal
7 meetings.
8 Q. Did there come a time when you both arrived
9 at at least a verbal understanding of exactly what
10 your compensation and benefits would be if you came
11 to work at Kent?
12 A. Yes, for the moment.
13 Q. When was that?
14 A. My terms of hire were clear when I was
15 hired and then altered when I started working.
16 Q. What did you understand to be -- I think
17 you told me you came to work on September 12th?
18 A. Yes.
19 Q. What did you understand to be the full
20 offer that had been made to you as of that date?
21 A. I would receive $120,000 salary. I was to
22 build, motivate, inspire and supervise a sales team,
23 get them to perform, and we had talked about five or
24 six -- but the number was ever changing depending on
25 what we were doing -- I had --

Page 77

1  get a chance to meet Mr. Hurley personally?
2  A. Not on that day.
3  Q. How much later did you meet him personally?
4  A. I would say within the week.
5  Q. You drove to Naples to meet him or he
6  happened to be in Miami for a meeting?
7  A. He came to Miami every week.
8  Q. How would you describe your relationship
9  with Mr. Hurley?
10  A. Not good.
11  Q. And why was that?
12  A. Pat and I had exchanged words through
13  e-mail.
14      When I first met him we went for lunch
15  together at the Big Apple Deli. He told me how
16  wonderful he was. He was very good at posturing
17  himself.
18  Q. He wrote you back an e-mail that was a
19  little bit on the strong side. We'll characterize it
20  as that. Correct?
21  A. Preposterous. Demeaning. Totally off
22  base. I had been there, I think, one week. I was
23  working on a bunch of different projects.
24  Q. The tone of his e-mail was like you're an
25  upstart coming in here, you're going to tell me how

Page 78

1  to do things? Correct? Something along those lines?
2  A. I'd have to refer to the e-mail.
3  Q. Was there a point where your relationship
4  with Mr. Hurley improved?
5  A. Tolerance between two people, if that's
6  what you call "improved."
7  Q. Did Mr. Hurley believe that he was in
8  charge of sales for the Naples office?
9      MR. CELLER: Object to form. Calls for
10  speculation.
11  A. To my understanding, Mr. Hurley was the
12  president of Kent Naples.
13  Q. Did you ever have any conversations with
14  Mr. Hurley about who was going to be responsible for
15  the sales in the Naples office?
16  A. No.
17  Q. As far as you understood, that was your
18  territory and that was your responsibility to cover
19  the Naples sales?
20      MR. CELLER: Object to form.
21  A. I was to help and assist with what needed
22  to be done in the Naples office.
23  Q. Did you have any conversations with
24  Mr. Neuman about this -- I'll just say a bad start
25  with Mr. Hurley?

Page 79

1      MR. CELLER: Object to form.
2  A. Yes.
3  Q. What was the nature of that conversation?
4  A. I think it was an e-mail that I sent to
5  Mr. Neuman regarding --
6  Q. Do you recall what that was?
7  A. I asked him to please help me with this
8  situation. I had just started here a week and this
9  was not a good way to start a situation, and he
10  arranged to have a meeting with Mr. Hurley and
11  myself.
12  Q. Tell me about the meeting.
13  A. About the meeting?
14      He basically sat there and let Pat and I go
15  at it.
16  Q. At the end of the meeting was there a
17  resolution to the differences?
18  A. No.
19  Q. Did you ever bring this up with Mr. Neuman
20  again?
21  A. Yes.
22  Q. When is the next time that was raised?
23  A. About a week later.
24  Q. What happened?
25  A. I sent him an e-mail with Mr. Hurley's

Page 80

1  e-mail attached to it and asked him what I should do
2  about it, how he wanted me to handle it. I was
3  trying to be professional.
4  Q. Did he respond?
5  A. No.
6  Q. Was that the end of the subject with Gil
7  regarding Mr. Hurley or was it raised again?
8  A. I'm not totally sure. There might have
9  been one other e-mail exchange back and forth.
10  Q. Is it your recollection that if you started
11  September 12th, that possibly these events occurred
12  within the next two weeks of your being there?
13  A. To the best of my recollection, it took
14  place within the first three weeks of my being there.
15  Q. What was your role with regard to
16  generating leads for the sales staff?
17      MR. CELLER: Object to form.
18      You can answer.
19  A. What was my role?
20      The generation of leads was to come from
21  the sales team, and I was supposed to motivate them
22  and build them and I offered suggestions on how to
23  get leads, where to look for leads. I wanted to do
24  mailings.
25  Q. Is that something you discussed with Gil?

Page 93

1  Q. So a $100 contest each month.
2     What else did you do to motivate them?
3  A. I taught them how to sell. If that's not
4  motivation -- if you know how to sell, you can make
5  money. If you don't know how to sell, you can't make
6  money.
7  Q. Did you sell e-mails out to any of the
8  people at Kent saying, "Congratulate Teri. She just
9  closed a deal for such and such"?
10 A. I think -- I wasn't into doing that.
11 Operations did that. I might have done that once,
12 but I don't remember, but at our meetings we would
13 all talk around and see what was going on.
14    The operations team did that for the
15 guards.
16 Q. You knew who Shelton Blackwell was?
17 A. Yes.
18 Q. You worked with Shelton. He was a member
19 of the operational team at that point?
20    MR. CELLER: At what point?
21    MS. LANGBEIN: September, October.
22 A. I don't recall if Shelton was a full member
23 of the operations team when I started. I know he was
24 a member of the operations team when I was there but
25 I don't know if that was his role when I started at

Page 94

1  the company.
2  Q. The first month you were there did the
3  sales increase at all?
4     MR. CELLER: Object to form.
5  A. Are you meaning September or October?
6  Q. You started September 12th, so you were
7  there for one month.
8     Did the sales increase at all during that
9  month?
10 A. Increase from what -- because I didn't know
11 what the sales were prior. Gil never went over,
12 "Here's what we did for the last six months."
13 Q. So when you took this job you had no idea
14 what the base was that you were starting from to have
15 a measurement of how you had improved?
16 A. No. I asked for it numerous times and I
17 didn't get it.
18 Q. Those requests were made to Mr. Neuman?
19 A. Yes, and to Rose because Gil told me to get
20 the documentation that I needed to get it from Rose
21 so I would ask Gil for something and he could tell
22 Rose -- ask me to get it from Rose -- and I never got
23 the documentation I was looking for so I really just
24 went on about my business to do what I was there to
25 do.

Page 95

1  Q. So these requests that you would make to
2  Gil were not responded to?
3  A. They were responded to with, "Ask Rose."
4  Q. So if you asked for something, he wasn't
5  the one who responded, he would refer you to someone
6  else?
7  A. He would respond and ask me to ask Rose.
8     MR. CELLER: Object to form.
9  Q. What was Rose's position at the time?
10 A. At the time I think she was in charge of
11 payroll.
12 Q. Was she an office manager?
13 A. I think that came later, but when I was
14 there she was a payroll person -- I don't know
15 100 percent -- I think she was payroll, and I think I
16 remember an e-mail going around that she was promoted
17 to office manager, but I don't know at what point
18 that was.
19 Q. What efforts did you make yourself, since
20 you weren't getting responses from Mr. Neuman, to try
21 and figure out what the sales had been prior to the
22 time you'd been there?
23 A. I asked Rose numerous times and she would
24 tell me she had to pull all the documents and she
25 didn't have enough time because she was doing payroll

Page 96

1  for X amount of employees. When I started doing
2  their commission reports I would kind of gauge
3  because there was an idea of what the -- the report
4  looked like -- but it was kind of hard to gauge.
5  Q. Did you ask the sales staff to provide you
6  copies of their prior reports?
7  A. They never had prior reports.
8  Q. So before you got there you're saying there
9  were no ways of reporting sales?
10    MR. CELLER: Object to form.
11 Mischaracterization.
12 Q. Mr. Schwartz had never implemented any type
13 of a system to show what the sales were?
14    MR. CELLER: Object to form.
15 A. To the best of my knowledge, there were no
16 reports.
17 Q. Were you able to tell what else
18 Mr. Schwartz had done as far as sales that you needed
19 to change?
20    MR. CELLER: Object to form.
21 A. Per my conversations with Gil at the
22 beginning and throughout the first few weeks he told
23 me I needed to get them to sell. They weren't
24 selling. So what did I need to do? I needed to get
25 them to sell.

**Page 105**

1  Q. Getting tired?
2  A. Not really.
3  Q. Did anyone at work comment on the fact
4  like, "Oh, my God. Are you okay?"
5  A. Nobody knew.
6  Q. Because you were in the sales office by
7  yourself and the sales staff was out in the field?
8  A. Yes.
9  Q. You were downstairs?
10 A. I was downstairs.
11 Q. Who would interact with you on a daily
12 basis while you were downstairs?
13 A. Yvonne, Yarid --
14 Q. Yvonne is Yvonne Rodriguez?
15 A. Yes.
16 Q. Okay.
17 A. Yarid.
18 Q. Yarid is with FISI?
19 A. Yes. We were in the same office together.
20    Lynette -- she was in operations -- Janac.
21    MR. CELLER: Is that two people?
22    THE WITNESS: Lynette Janac.
23 A. I would interact with everybody in the
24 office every single day from top to bottom.
25 Q. Neither Yvonne, Yarid nor Lynette made any

**Page 106**

1  comment to you like, "Oh, my gosh. Are you feeling
2  okay?"
3  A. No.
4  Q. Tell me about the working relationship that
5  you had with Lynette Janac, because that's someone
6  else that you have listed as a witness in this case.
7  What does she know about your case?
8  A. Lynette and I started within a week or two
9  of each other and she worked there I think until
10 January, but I'm not 100 percent on that.
11    She was -- Gil had me interview her and we
12 hit it off. She was nice and I said, "Oh, what are
13 you interviewing for? Why am I interviewing you?"
14    "Oh, I'm going to be president of the
15 company."
16    I was like, "Why am I interviewing you?"
17    Lynette and I worked really hard to change
18 the culture of what was going on at Kent. We cleaned
19 it up. The office was disgusting. We put new floors
20 in. We had Gil put new floors. We kind of took on
21 the whole project of the company. Gil told us to
22 make it nice.
23 Q. When you say you took it on to change the
24 culture of the company, what did you mean by that?
25 A. There was a total lack of communication

**Page 107**

1  with everyone in the company. The right hand didn't
2  know what the left did. The left hand didn't know
3  what the right foot did, and so forth and so on. It
4  was not a good culture to work in.
5     Lynette and I were very positive people and
6  we figured we could try and make a difference if we
7  got people communicating, had meetings with the
8  operation and the sales staff, brought the sales
9  staff into operational issues, because the sale
10 really started with the sales staff, and then after
11 an account was taken over the prior methodology that
12 they used was the sales staff didn't have anything to
13 do with the account after.
14    We didn't feel that was good. We felt that
15 your initial salesperson is the person you should
16 still have contact with along with your operational
17 person, because rather than lose an account we'd like
18 to see what's going on, so we really merged
19 operations and sales.
20 Q. It sounds like you had many meeting over
21 these issues.
22    Did you ever mention to her during this
23 period of time that you were pregnant?
24 A. After I announced it. We didn't discuss it
25 before I announced my pregnancy.

**Page 108**

1  Q. Do you know why Lynette left Kent?
2  A. She went to work back in her old field.
3  She was a publisher in -- I think it's Auto Guide.
4  Q. Can she ever express to you that she was
5  dissatisfied with working at Kent?
6  A. Yes.
7  Q. What did she tell you?
8  A. She didn't like the culture. Things
9  weren't changing. She didn't like the environment.
10 Anything Gil had told her was not what he was
11 holding -- I guess he wasn't meeting his end of the
12 bargain.
13    MR. CELLER: When you find a good place to
14 stop, I just need to use the restroom for two
15 minutes.
16    MS. LANGBEIN: We are kind of in a lunch
17 mode, too. Let me just finish with this line.
18    MR. CELLER: Sure.
19 Q. So her impression of Mr. Neuman was that he
20 would make a deal and then change the terms later on?
21 A. Yes.
22 Q. Was she having problems communicating with
23 him, as well?
24    MR. CELLER: Object to form.
25    You can answer if you know.

Greenfield v.
Kent Security Services

Ellen Greenfield
February 12, 2009

**Page 177**

1   with him on commissions and that nature in the
2   beginning of the month. I usually had it, like I
3   told you before, in the first few days.
4          (Short break.)
5      Q. I know we disagree about whether the e-mail
6   that Mr. Neuman sent to you contained sales quotas or
7   what you construed to be a bonus opportunity, but
8   would you agree with me that -- I'm going to show you
9   again Defendant's Number 5 -- that in no month prior
10  to February, 2007 had you or your team ever met the
11  numbers that are contained in that e-mail?
12         MR. CELLER: Object to form.
13     A. I would disagree.
14     Q. Tell me why.
15     A. I have my notes and we hit it in the month
16  of December. We hit over 801,000 and some change.
17     Q. You would agree with me that the e-mail
18  talks about 800,000 a month for Kent and $250,000 per
19  month for FISI. Correct?
20     A. It says 250,000 per month of integrations.
21     Q. "Integrations" being FISI?
22     A. Yes.
23     Q. So did you in any month between the time
24  you were hired and the time you had this meeting in
25  mid February -- had you ever met those goals -- you

**Page 178**

1   and your sales team?
2          MR. CELLER: Object to form.
3      A. We made the $800,000 per month of security
4   service and through our working document with Gil we
5   weren't supposed to focus on FISI. They were having
6   problems with FISI. Yarid was in and out of FISI.
7   There was not much activity going on there.
8      Q. So is it your testimony today that Gil told
9   you, "Don't concentrate on FISI. Just concentrate on
10  Kent"?
11         MR. CELLER: Object to form.
12         Go ahead.
13     A. Gil told me to concentrate on building and
14  motivating a sales team. My job was to build and
15  motivate a sales team.
16     Q. Who was the highest producing salesperson
17  while you were the VP of sales and marketing?
18     A. It was either Teri or Kevin.
19     Q. We have several Kevins. Kevin McCarthy?
20     A. Cardiff.
21     Q. That's the one who you said was on the
22  tailcoats of Todd Schwartz?
23     A. Yes.
24     Q. And he left some time in December of '06.
25  Correct? I think we established that before.

**Page 179**

1      A. I don't know that we established the
2   timeline from when he left.
3          You told me Jill left February 13th or
4   February 3rd, and Kevin left the same day that drug
5   test was given, so I would have to refer to when the
6   drug test was given.
7      Q. Actually, I show his date of termination as
8   12/12/06.
9      A. Okay. He wasn't terminated. It was date
10  of resignation.
11     Q. You would agree with me after that point he
12  wasn't there so Teri would have been the highest
13  producing after December?
14     A. Yes.
15     Q. Did anyone come close to her?
16         MR. CELLER: Object to form.
17         You can answer.
18     A. I don't know. Everyone else was brand new.
19  I mean, they were one and two months old and Teri had
20  been there, to the best of my knowledge, I think
21  three years.
22         Teri had a much fuller pipeline, but I
23  helped her close everything in her pipeline.
24     Q. Did you accompany her on a sales call to a
25  development called Hollywood Oaks?

**Page 180**

1      A. Yes, I did.
2      Q. You met with someone named David
3   Clattenberg?
4      A. Yes.
5      Q. Did you make that deal for her?
6      A. We didn't get that deal.
7      Q. Do you know why?
8      A. Well, I do now, because I've since spoken
9   with David Clattenberg, and the company that he chose
10  had better rates and better guards.
11     Q. So when you don't make a sale you check to
12  find out what it was about your proposal that was
13  deficient?
14     A. Always.
15     Q. So the call that you made to David
16  Clattenberg was right after he had awarded it to
17  another company?
18     A. Soon thereafter, yes. That was my standard
19  practice.
20     Q. Do you remember going with Teri up to
21  CityPlace in West Palm Beach?
22     A. I think it was Cityside. I think -- are
23  you talking about the office building or the
24  community?
25     Q. I understand CityPlace to be a shopping

Min-U-Script®     Friedman, Lombardi & Olson     (45) Page 177 - Page 180

Ellen Greenfield  
February 12, 2009                                                      Greenfield v.  
                                                                        Kent Security Services

Page 189

1  Q. And Jason was the gentleman that you named
2  as your former fiance?
3  A. Yes.
4  Q. He was still willing to talk to you even
5  though you broke his heart and you didn't marry him?
6  A. It wasn't like that, but we're still
7  friends. We're still friends to this day.
8  Q. Does Jason practice in this area?
9  A. Workers comp in Fort Lauderdale.
10  Q. Did he provide you any type of advice as to
11  how to deal with the situation?
12      MR. CELLER: Answer "yes" or "no."
13  A. Yes.
14  Q. Did he tell you that he would handle your
15  case?
16  A. No.
17  Q. Did he refer you to anyone else?
18  A. He gave me a couple of attorneys' names to
19  call.
20  Q. Do you recall the names?
21  A. Can I recall the names? No. I'm sorry.
22  Q. When did you find your fine lawyer
23  Mr. Celler?
24  A. When did I find him? On a sidewalk.
25  No. I found him through a girlfriend of

Page 190

1  mine -- her husband.
2      MR. CELLER: You'll know who it is if you
3  ask.
4      MS. LANGBEIN: Who was it?
5      MR. CELLER: Brian Lerner. We used to
6  practice together at Morgan, Lewis and Steele.
7  Q. When did you first have contact with
8  Mr. Celler? Again, we're not going into
9  conversations. Just when.
10      Stop being nervous.
11      MR. CELLER: I remember the date. I
12  remember what prompted it.
13  A. I don't --
14      MR. CELLER: Want me to tell her?
15      MS. LANGBEIN: No.
16      THE WITNESS: I'm sorry.
17  Q. Was it before or after you --
18  A. I think it was March.
19  Q. Was it before or after Gil demoted you?
20  A. I don't remember. I wish I remembered.
21  I'm sorry.
22  Q. Let's back up to the late February date.
23  We've established it's late February. You
24  went to see Henry. He told you he would look into it
25  and you said two weeks later you were demoted.

Page 191

1  Did Henry ever get back to you?
2  A. No.
3  Q. Did Henry ask you to give him any
4  information?
5  A. In terms of information from the prior --
6  please clarify.
7  Q. When you had the discussion with Henry and
8  you told him about your meeting with Gil and what Gil
9  had said, that he wasn't happy, did Henry ask you at
10  that time to provide him any other type of
11  information.
12  A. I told him what it happened, and that was
13  it.
14  Q. He didn't ask you to provide any other
15  information?
16  A. No. I think when I told him what had
17  happened -- transpired in that meeting -- he said he
18  would look into it for me and get back to me.
19  Q. Did you know if Henry ever had a
20  conversation with Gil?
21  A. Prior to my being demoted or after?
22  Q. After this meeting that you had with him.
23  A. I do not know.
24  Q. Because he never got back to you and said,
25  "I told Gil and this is what happened"?

Page 192

1  A. Exactly.
2  Q. Let's talk about your spiral notebook since
3  this is the only one I have.
4      MR. CELLER: Object to form. Incorrect.
5      MS. LANGBEIN: No, it is not incorrect.
6      MR. CELLER: It is. It is.
7      MS. LANGBEIN: You know what?
8      THE WITNESS: You have a lot of orange
9  papers.
10      MS. LANGBEIN: Yes. We do have a lot
11  orange papers.
12      I'm showing you -- I don't really have
13  another copy. Maybe I do.
14      Here's another copy of what you gave me.
15      You know what? Maybe part of this is --
16  we'll go through it.
17  Q. Will you take a look at this whole document
18  and tell me if this constitutes your entire spiral
19  notebook, or does this document also include the
20  notebook -- the other notebook, the Franklin Covey
21  notebook -- we were talking about?
22  A. That's probably I had to pull reports.
23  That went with a contract, I'm sure.
24  Q. I wouldn't know because your attorney gave
25  it to me all uncategorized.

Page 237

1   Do you see that?
2   A. Right, but then it was also any sale I
3   personally make will be paid commission in addition
4   to my base salary.
5       What Gil and I had discussed was if a call
6   came in for sales, I could take that call.
7       If that meant that I had to go outside the
8   office, I could go outside the office because no
9   sales were made inside. We had to go meet clients.
10  If a lead came into the front office, I could take
11  that.
12  Q. So your understanding of the conversation
13  that you had with Gil, the meeting that you had, was
14  that even though you were specifically assigned
15  inside sales, that also meant you could leave the
16  office to go meet the person to discuss the sale, the
17  prospect?
18  A. Yes. There would be no way to make inside
19  sales.
20  Q. Well, isn't there a way to make inside
21  sales when somebody calls and says, "Hi, I'd like to
22  hire Kent. I need security guards"?
23  A. You have to go out and survey the property
24  and meet with the client.
25  Q. You would agree with me that that's not the

Page 238

1   only type of security guard work that Kent does --
2   correct -- they do events?
3       Like the Purim carnival?
4   A. They do events.
5   Q. There would be no need to go out and survey
6   that. Correct?
7       "We need two guards for our Purim
8   carnival."
9       That would be an inside sale. Correct?
10  A. We still were required to meet with the
11  individual.
12  Q. That's something that you remember Gil
13  specifically saying to you -- that you were still
14  required to meet with the individual?
15  A. It was part of our job description.
16  Q. Was there a job description for inside
17  sales?
18  A. No. Those were the two job descriptions and
19  then sales.
20      I already knew what sales was.
21  Q. If you will turn to the very next page, you
22  will see that Mr. Neuman responds to your e-mail on
23  April 18th, 2007.
24      MR. CELLER: It's a new packet of exhibits?
25      THE WITNESS: No. It's right --

Page 239

1       MR. CELLER: Got it.
2   Q. And in this e-mail to him you are
3   complaining about the fact that you believe you're
4   getting paid something differently than what he
5   recollected. Correct?
6   A. Yes.
7   Q. You sent that e-mail at 12:26 p.m. to him
8   and he responded to you immediately at 12:40 p.m.?
9   A. Yes.
10  Q. It wasn't through Rose, it was directly to
11  you. Correct?
12  A. Yes.
13  Q. He states to you that his recollection is
14  different. Right?
15  A. Yes.
16  Q. The second page after that is just the end
17  of your e-mail to him?
18  A. Yes.
19  Q. And it looks --
20  A. It's a double.
21  Q. So we'll get rid of that.
22  A. Here you go.
23  Q. So now we have figured out that Mr. Neuman
24  had a different recollection than you did about what
25  that conversation was.

Page 240

1       MR. CELLER: Was this Number 6 -- this
2   packet?
3       THE WITNESS: 7.
4       MR. CELLER: Number 7 was this
5   (indicating). I just want to make sure you're
6   marking them in the right order. We just marked this
7   as 8.
8       MS. LANGBEIN: 7 is the calendar, and 8 is
9   the e-mail.
10      THE WITNESS: You didn't mark the book?
11      MS. LANGBEIN: No.
12      MR. CELLER: Do we have all the exhibits
13  accounted for?
14  Q. All right. Now, let's go to some other
15  documents. I'm just going to show you. I'm not
16  going to make them part of the record.
17      I'm going to show you a bunch of documents
18  and just ask you what these are. These look to me to
19  be marketing materials that you were working on?
20      Do you recognize those, what I'm showing
21  you -- looks like marketing letters to go out to
22  people?
23  A. The first two --
24  Q. Yes.
25  A. -- are not marketing letters. They're

Page 241

1  websites.
2  Q. Website contact?
3  A. -- website contact, yes.
4    This next piece of mail -- I don't know
5  what this is. I don't know who Charles Lasker is and
6  I don't know what this is.
7    I don't know if this was something that was
8  given to me that I was supposed to review and
9  incorporate into marketing materials -- I'm not sure
10 on that.
11 Q. Then we have this kind of promotional
12 brochure that's got a picture, I think, of Frank
13 Vargas.
14 A. Yes. This was actually a postcard that we
15 were making.
16 Q. This was something you were working on
17 after the demotion?
18 A. I was working on these -- I have three
19 here -- and it was a series of three and I was
20 actually working on this during my time as
21 vice-president of sales as well.
22    Lynette was there and we were working on
23 these together. We were doing a try direct marketing
24 piece to the guards, so we were working on this
25 together.

Page 242

1  Q. So this is your handwriting on the second
2  page where it says: New hires required to work three
3  months before referral bonus is paid?
4  A. Uh-huh.
5  Q. You'll notice there's a different
6  handwriting. That's Lynette's handwriting?
7  A. Yes.
8  Q. The first one you had the e-mail to L.
9  Janac at Kent Security. The third piece has a
10 picture of a guard and your handwriting "Kent logo
11 needed" with -- noting typos?
12 A. Right, and colors we needed to use because
13 I didn't have a color printer.
14 Q. Was this done the -- the third page -- was
15 that done after your demotion?
16 A. I'm not sure. It was a work in progress so
17 I don't know what the exact time frame was.
18 Q. Is the handwriting on the top of this --
19 does that say: Done 3/29 -- is that yours -- on the
20 website content?
21 A. I don't know. I think it's my handwriting.
22 I almost think it's my handwriting. It was finished
23 and I knew that project was done.
24 Q. So the 29th would have been the date that
25 you finished it then?

Page 243

1  A. Yeah. It doesn't mean it was delivered.
2  It meant that I possibly finished working on the
3  content for that section.
4  Q. At this point you were still reporting to
5  Mr. Neuman?
6  A. On 3/29? I believe so.
7  Q. I'm going to show you an e-mail dated
8  March 30th, 2007. Maybe that will refresh your
9  recollection.
10    This is a progress report from you to
11 Mr. Neuman about those postcards. Correct?
12 A. This was actually about different
13 postcards.
14 Q. But it looks like you weren't reporting
15 through Rose, you were reporting directly to
16 Mr. Neuman?
17 A. At this point, yes, I was, through e-mail.
18 Q. You mentioned to me that late February is
19 when you went to Henry and told him about what you
20 perceived to be discrimination.
21    Did anything occur between February 29th
22 and March 30th with regard to Mr. Neuman that you
23 believe to be discrimination based on your pregnancy?
24    MR. CELLER: Object to form.
25 A. Yes. After I reported -- after I had my

Page 244

1  meeting with Gil that we discussed earlier I then
2  went to tell Henry and he told me he would look into
3  it. The following week or ten days I was then
4  demoted.
5  Q. What I'm talking about is: After that
6  point you still were having contact with Mr. Neuman?
7  A. Only through e-mail.
8  Q. So was there anything that occurred during
9  that next two-week period of time between the date of
10 your demotion and the March 30th day that was
11 discriminatory?
12 A. Yes. He wouldn't speak to me anymore. I
13 could only speak with him via e-mail and a lot of
14 times there are other e-mails in my notes that he
15 didn't answer, never responded to.
16 Q. You'll notice on this particular e-mail
17 that he did respond. Correct?
18    MR. CELLER: Object to form.
19 A. I only have this page. I have to see what
20 you're looking at.
21 Q. I think I gave you --
22 A. Is it this down here -- April 18th?
23 Q. I'm showing you another e-mail. We'll mark
24 that one as Defendant's 9.
25