EXHIBIT "A"

**Condensed Transcript**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 08-22033-CIV-ALTONAGA BROWN

ELLEN GREENFIELD

Plaintiff,

vs.

KENT SECURITY SERVICES, INC.

Defendant.

**VIDEOTAPED DEPOSITION OF**

**GIL NEUMAN**

**VOLUME II**

Taken on Behalf of the Plaintiff

March 31st, 2009
9:19 a.m.

515 East Las Olas, Suite 1300
Fort Lauderdale, Florida 33301

Varonica L. Beal, Professional Reporter



Toll Free: 877.495.0777
Facsimile: 954.987.7780
Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

100

Thereupon,
            GIL NEUMAN,
being by the undersigned Notary Public first duly
sworn, was examined and testified as follows:
            THE WITNESS: I do.
            DIRECT EXAMINATION
BY MR. CELLER:
    Q  Good morning, Mr. Neuman. You understand
you're here as part of your continued deposition
from December 17, 2008, correct?
    A  Yes.
    Q  What did you do to prepare for the second
half of your deposition here today?
    A  Nothing.
    Q  Did you review your transcript from the
prior deposition I took?
    A  No.
    Q  Did you review any documents?
    A  No.
    Q  Do you know who Leyda Tolentino is?
    A  Yes.
    Q  Who is she?
    A  A lady that used to work in our legal
department.
    Q  What was her job in the legal department?

101

    A  Coordinator.
    Q  Was there a lawyer that worked in house at
Kent Security during Ms. Tolentino's employment?
    A  I don't think so.
    Q  Okay. When was the last time you spoke to
Ms. Tolentino?
    A  I don't know exactly the date, but
somewhere around five, six months ago.
    Q  Okay. And did you contact her?
    A  No.
    Q  Okay. Did she contact you?
    A  Yes.
    Q  And what was the reason -- strike that.
       Did she explain to you why she was contacting
you?
    A  I don't remember the detail. But we had a
very nice exchange of niceties, politeness.
    Q  Did she tell you why she was calling?
    A  No.
    Q  Did you and she discuss the pending
lawsuit by Ellen Greenfield?
    A  No.
    Q  Did you guys discuss -- strike that.
       Did Mrs. Greenfield's name come up at all
during that conversation?

102

    A  I think she mentioned being pursued in
this case, but that's about it.
    Q  Okay. And did you at any point tell her
that if she was contacted by Mrs. Greenfield or her
lawyer that she should do anything in particular?
    A  No.
    Q  Okay. How long did the conversation last?
    A  Five minutes.
    Q  And as you sit here today, is it your
understanding that she just called to say hello out
of the blue?
    A  I have not spoken to her since she left.
So it was kind of like where have you been, hello,
what are you doing now, how is your family, your
kids, your husband. Nothing more than that.
    Q  Was she married?
    A  I thought so, yes.
    Q  Is it your testimony that, other than that
one conference approximately six months ago, you
have not spoken to her since?
    A  That's correct.
    Q  Have you corresponded with her in writing
in any way?
    A  No.
    Q  Have you sent her a letter?

103

    A  No.
    Q  Do you know if anybody sent her a letter
on your behalf?
    A  No.
    Q  Did you instruct anybody to send her a
letter?
    A  No.
    Q  Fair enough. Now, what was the date to
your knowledge that Mrs. Greenfield was no longer in
a management position of Kent Security?
    A  What's the date of employment, if you can
help me?
    Q  Sure. My understanding is she was
employed from September '06 through May of '07, or
in early May of '07 she resigned.
    A  My recollection was September of '06 to
probably April of '07.
    Q  Okay. Do you know when you made the
decision to demote her?
    A  Yes. Probably in February.
    Q  When did you advise her of that decision
that you were going to be demoting her?
    A  Late February.
    Q  Would it be fair to say that by the time,
that by the end of March 2007 she was no longer in a



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

## Page 164

1  told you I think your best thing is to get rid of
2  her.
3  Q  Okay.
4  A  He felt she doesn't know change, she
5  doesn't know sales, she doesn't know how to motivate
6  people, she doesn't know how to manage people, none
7  of these.
8  Q  Any specific examples though, other than
9  these generalities that we are discussing, can you
10 remember any specific customer instance where this
11 arose?
12 A  I mean there was a terrible fight when I
13 think Ellen had to go to Naples once, and there were
14 customer waiting and she never showed up. And then
15 she said there was no appointment and the customer
16 were furious that she never showed up.
17 Q  Okay. Who was the customer?
18 A  I don't know. I think there were four of
19 them. There was one incident of four meetings that
20 she never showed up.
21 Q  Would there be a record or a disciplinary
22 note saying, you didn't show up for this meeting?
23 A  There should have been, but no there
24 isn't.
25 Q  Okay. So as you sit here today, could you

## Page 165

1  identify the four customers or the four meetings
2  which Mrs. Greenfield apparently didn't show up for?
3  A  I personally cannot, but I can tell you
4  who can.
5  Q  Who?
6  A  Shelton. Because he was standing there
7  waiting.
8  Q  Okay. Shelton Blackwell?
9  A  Yes.
10 Q  Okay. And do you know whether
11 Mrs. Greenfield had correspondence with
12 Mr. Blackwell advising why the meeting was not going
13 to happen and why she wasn't there?
14 A  From what I gather she told him that it
15 was a misunderstanding and she told the customer
16 she's not coming. And he told her, that's not true,
17 I was there standing and waiting with the customer.
18 It was on and on and on.
19 Q  Okay. What was Mr. Blackwell's position
20 with the company?
21     MS. LANGBEIN: At that time?
22     THE WITNESS: Vice president.
23 BY MR. CELLER:
24 Q  That was during Mrs. Greenfield's
25 employment?

## Page 166

1  A  Yes. I don't know if he was a vice
2  president because at one point he was there, and
3  then one point we moved him to the east coast. Then
4  we made him into the president. So I'm not quite
5  sure.
6  Q  Is he still employed by the company?
7  A  Yes.
8  Q  What's his position now?
9  A  He's the president.
10 Q  Of what?
11 A  Kent.
12     MS. LANGBEIN: Of the defendant?
13     THE WITNESS: Yes.
14 BY MR. CELLER:
15 Q  Wasn't that your position previously?
16 A  No.
17 Q  Who was the president of Kent before
18 Mr. Blackwell? When I say "Kent", the defendant.
19 A  At one point Todd Schwartz was the
20 president.
21 Q  And who was the president after Todd
22 Schwartz?
23 A  I don't think anybody was.
24 Q  So it was a vacant position?
25 A  Yes. Many times there are vacant

## Page 167

1  positions.
2  Q  Okay. So we have identified she -- I'm
3  trying to identify all the reasons why you believe
4  Mrs. Greenfield was incompetent. So we've talked
5  about, you didn't believe she was building a sales
6  force, correct?
7  A  That's correct.
8  Q  Talked about that she had some
9  disagreements with Pat Hurley?
10 A  This was just when you asked about Pat.
11 There were other people who felt the same way.
12 Q  Who else?
13 A  Shelton felt the same way.
14 Q  Shelton. Did Shelton ever e-mail you
15 saying, get rid of her?
16 A  No.
17 Q  Is there anything in writing that would
18 confirm that Shelton said, I don't feel she's
19 competent?
20 A  I don't know. I don't --
21     MS. LANGBEIN: Objection to form.
22     THE WITNESS: I don't remember e-mails,
23 but I was a loner.
24 BY MR. CELLER:
25 Q  What does that mean?



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

**228**

1  your understanding?
2      MS. LANGBEIN: Objection to form.
3      THE WITNESS: I don't think it's
4  appropriate to say that, if I didn't respond I
5  agree.
6  BY MR. CELLER:
7      Q   So let me ask you this question. If Mrs.
8  Greenfield had put in here, my new base salary will
9  be $3 million, would of you responded to that?
10     MS. LANGBEIN: Objection. To form.
11     THE WITNESS: I don't know.
12 BY MR. CELLER:
13     Q   Do you have a recollection of telling her
14 she will make $75,000 a year?
15     A   My recollection was 60.
16     Q   Did you make any notes of that
17 conversation?
18     A   No.
19     Q   Okay. Fair enough. And would you agree
20 that in this letter, Mrs. Greenfield is not asking
21 for your confirmation, she's confirming what she
22 understood the conversation to be?
23     A   The way she wrote it, she's not asking for
24 confirmation.
25     Q   Would you agree that if there was a

**229**

1  response from you to this e-mail, you would have
2  provided it already?
3      A   Yes.
4      MR. CELLER: Okay. Let's go ahead and
5  mark this as No. 15.
6      (Plaintiff's Exhibit No. 15 was marked for
7  identification.)
8  BY MR. CELLER:
9      Q   Showing you what we mark as Exhibit
10 No. 15, which for the record, is an e-mail from
11 Ellen Greenfield to you copying Henry Hartley on
12 April 18, 2007; do you see that?
13     A   Yes.
14     Q   Now, take a moment to review this. Let me
15 know when you're done, Mr. Neuman, please.
16     A   Is there a date on this?
17     Q   There's an e-mail there. But I will
18 represent to you that I don't know where the actual
19 e-mail version is. If you want we can take a break
20 and we can have my office find it. But I will
21 represent to you that this e-mail that was marked as
22 Plaintiff's Exhibits No. 14 preceded the one that we
23 are now looking at as Exhibit 15.
24     A   Do we know when?
25     Q   There's a record of it. If you want, we

**230**

1  can come back and send you another Request for
2  Admissions. That's the version that I have for some
3  reason.
4      A   It's interesting for me to see the date.
5      Q   As an officer of the court, I will
6  represent to you that this was before what we are
7  looking at --
8      A   Not before. After the date.
9      MR. CELLER: I don't know the actual date.
10     MS. LANGBEIN: Maybe we could take a break
11 and you can look.
12     MR. CELLER: I don't know even where to
13 find that at this point, Leslie.
14     MS. GREENFIELD: She has it.
15     MS. LANGBEIN: Your client has it on her
16 Black Berry.
17     MS. GREENFIELD: Not on this one. I can
18 go in the phone and get it.
19     MS. LANGBEIN: I know from last time you
20 pulled up stuff in your Black Berry.
21     MR. CELLER: Let's go off the record.
22     THE VIDEOGRAPHER: We are going off the
23 video record at 11:35 a.m.
24     (Discussion was had off the record.)
25     THE VIDEOGRAPHER: We are back on the

**231**

1  video record at 11:45 a.m.
2  BY MR. CELLER:
3      Q   Mr. Neuman, we were discussing, just to
4  clarify, with regard to Exhibit 14 is the
5  understanding among Counsel, and we are in the
6  process of getting a replacement 14, that No. 14 was
7  sent on or about March 15, 2007. And now if you
8  take a look at Exhibit 15, which is an e-mail from
9  Ellen to yourself copying Henry Hartley dated
10 April 18, 2007, Mrs. Greenfield -- have you a moment
11 to review it by the way?
12     A   Yes.
13     Q   Mrs. Greenfield is saying that you're
14 paying her less than what she indicated she should
15 be paid in Exhibit 14?
16     A   Yes. That's what it says here.
17     Q   And she's also saying at that point that
18 she feels that you're not responding to any of her
19 e-mails or avoiding speaking with her directly; do
20 you recall her making that allegation?
21     MS. LANGBEIN: Objection to form.
22     THE WITNESS: I recall -- I don't know if
23 she made the complaint before this. She
24 probably made the complaint before this e-mail.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

**Condensed Transcript**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 08-22033-CIV-ALTONAGA BROWN

ELLEN GREENFIELD

    Plaintiff,

vs.

KENT SECURITY SERVICES, INC.

    Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**VIDEOTAPED DEPOSITION OF**

**GIL NEUMAN**

**VOLUME III**

Taken on Behalf of the Plaintiff

March 31st, 2009
1:00 p.m.

515 East Las Olas, Suite 1300
Fort Lauderdale, Florida 33301

Varonica L. Beal, Professional Reporter



ESQUIRE

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

**298**

1  A  No. It looked like a chart, but I have
2  seen a hundred different charts.
3  Q  Do you have any reason to believe that
4  this is not the chart in effect during
5  Mrs. Greenfield's employment with the defendant?
6  A  Looking at the names, no, I don't have any
7  reason to believe.
8  Q  So would you agree that this is an
9  accurate description of the corporate hierarchy
10 during Mrs. Greenfield employment with the
11 defendant?
12 A  Hold on. I'm starting to see some people
13 are missing here. Where is Pat? Where is Shelton?
14     MS. LANGBEIN: I don't know if you can
15 read this.
16     THE WITNESS: It says, Henry Hurley.
17 Where is Pat here? I don't see Pat. I don't
18 see Shelton.
19 BY MR. CELLER:
20 Q  Okay.
21 A  Some people are not here.
22 Q  Okay. Let me ask you this. If you take a
23 look, Mr. Hartley comes under compliance manager,
24 correct?
25 A  That's correct.

**299**

1  Q  And then you have Leyda Tolentino over to
2  the left in the legal department?
3  A  Yes, that's correct.
4  Q  And then you have somebody named Mary
5  Blanco, that's human resources.
6  A  That's correct.
7  Q  Okay. What was her job title?
8  A  Mary Blanco is one of those individuals
9  each office interviewing security officers, hiring
10 them, yes.
11 Q  Who was responsible for maintaining
12 personnel files.
13 A  She was for her area.
14 Q  Do you know whether Ms. Tolentino and
15 Mr. Hartley had any prior experience in
16 investigating claims of discrimination?
17 A  We looked -- do I know their experience,
18 no, I don't know their experience.
19 Q  During their employment with Kent, had
20 they ever investigated any other allegations of
21 discrimination?
22 A  Always.
23 Q  Okay. What other allegations --
24 A  Whenever we got a complaint we returned to
25 Henry for investigation.

**300**

1  Q  And what sort of training --
2     MS. LANGBEIN: I was just going to caution
3  my client to please wait for the question so
4  the court reporter doesn't have a fit.
5     THE WITNESS: Sorry.
6     MS. LANGBEIN: And then answer.
7  BY MR. CELLER:
8  Q  And do you what training, if any,
9  Mr. Hartley had in investigating claims of
10 discrimination?
11 A  Mr. Hartley as far as his previous
12 training, I don't know.
13 Q  What about Ms. Tolentino, do you know
14 whether she had --
15     MS. GREENFIELD: I am trying to get it to
16 shut off.
17 BY MR. CELLER:
18 Q  Do you know whether Ms. Tolentino had any
19 prior training or experience in investigating
20 complaints of discrimination?
21 A  I think Ms. Tolentino worked in the legal
22 office as an investigator.
23 Q  Do you know whether that legal office
24 involved employment law or discrimination?
25 A  I don't know.

**301**

1  Q  Now, why was Ms. Blanco not asked to
2  investigate Mr. Greenfield's claims of
3  discrimination if she was in human resources?
4  A  Because Ms. Blanco's role was the
5  interviews and hiring of the rank-and-file type.
6  Q  Where was Mrs. Greenfield's personnel file
7  kept?
8  A  I don't know.
9  Q  Was Mrs. Blanco in charge of Mrs.
10 Greenfield's personnel file?
11 A  I don't think so.
12 Q  Are management personnel files kept
13 separate from everybody else?
14 A  They should, yes.
15 Q  Do you know as you sit here today whether
16 that's accurate?
17 A  I think so.
18 Q  Now on here it says, human resources for
19 Ms. Blanco?
20 A  Yes.
21 Q  You are saying that there was not a
22 separate division, but Kent or the defendant did
23 employ human resources employees during
24 Mrs. Greenfield's employment, correct?
25 A  Mary Blanco was an HR person at the time,



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

## 298

1  A   No. It looked like a chart, but I have
2  seen a hundred different charts.
3  Q   Do you have any reason to believe that
4  this is not the chart in effect during
5  Mrs. Greenfield's employment with the defendant?
6  A   Looking at the names, no, I don't have any
7  reason to believe.
8  Q   So would you agree that this is an
9  accurate description of the corporate hierarchy
10 during Mrs. Greenfield employment with the
11 defendant?
12 A   Hold on. I'm starting to see some people
13 are missing here. Where is Pat? Where is Shelton?
14     MS. LANGBEIN: I don't know if you can
15 read this.
16     THE WITNESS: It says, Henry Hurley.
17 Where is Pat here? I don't see Pat. I don't
18 see Shelton.
19 BY MR. CELLER:
20 Q   Okay.
21 A   Some people are not here.
22 Q   Okay. Let me ask you this. If you take a
23 look, Mr. Hartley comes under compliance manager,
24 correct?
25 A   That's correct.

## 299

1  Q   And then you have Leyda Tolentino over to
2  the left in the legal department?
3  A   Yes, that's correct.
4  Q   And then you have somebody named Mary
5  Blanco, that's human resources.
6  A   That's correct.
7  Q   Okay. What was her job title?
8  A   Mary Blanco is one of those individuals
9  each office interviewing security officers, hiring
10 them, yes.
11 Q   Who was responsible for maintaining
12 personnel files.
13 A   She was for her area.
14 Q   Do you know whether Ms. Tolentino and
15 Mr. Hartley had any prior experience in
16 investigating claims of discrimination?
17 A   We looked -- do I know their experience,
18 no, I don't know their experience.
19 Q   During their employment with Kent, had
20 they ever investigated any other allegations of
21 discrimination?
22 A   Always.
23 Q   Okay. What other allegations --
24 A   Whenever we got a complaint we returned to
25 Henry for investigation.

## 300

1  Q   And what sort of training --
2      MS. LANGBEIN: I was just going to caution
3  my client to please wait for the question so
4  the court reporter doesn't have a fit.
5      THE WITNESS: Sorry.
6      MS. LANGBEIN: And then answer.
7  BY MR. CELLER:
8  Q   And do you what training, if any,
9  Mr. Hartley had in investigating claims of
10 discrimination?
11 A   Mr. Hartley as far as his previous
12 training, I don't know.
13 Q   What about Ms. Tolentino, do you know
14 whether she had --
15     MS. GREENFIELD: I am trying to get it to
16 shut off.
17 BY MR. CELLER:
18 Q   Do you know whether Ms. Tolentino had any
19 prior training or experience in investigating
20 complaints of discrimination?
21 A   I think Ms. Tolentino worked in the legal
22 office as an investigator.
23 Q   Do you know whether that legal office
24 involved employment law or discrimination?
25 A   I don't know.

## 301

1  Q   Now, why was Ms. Blanco not asked to
2  investigate Mr. Greenfield's claims of
3  discrimination if she was in human resources?
4  A   Because Ms. Blanco's role was the
5  interviews and hiring of the rank-and-file type.
6  Q   Where was Mrs. Greenfield's personnel file
7  kept?
8  A   I don't know.
9  Q   Was Mrs. Blanco in charge of Mrs.
10 Greenfield's personnel file?
11 A   I don't think so.
12 Q   Are management personnel files kept
13 separate from everybody else?
14 A   They should, yes.
15 Q   Do you know as you sit here today whether
16 that's accurate?
17 A   I think so.
18 Q   Now on here it says, human resources for
19 Ms. Blanco?
20 A   Yes.
21 Q   You are saying that there was not a
22 separate division, but Kent or the defendant did
23 employ human resources employees during
24 Mrs. Greenfield's employment, correct?
25 A   Mary Blanco was an HR person at the time.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com