EXHIBIT "B"

**Condensed Transcript**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

ELLEN GREENFIELD,

    Plaintiff,

vs.

KENT SECURITY SERVICES, INC.,

    Defendant.

CASE NO: 08-22033-CIV
ALTONAGA/BROWN

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**VIDEOTAPED DEPOSITION OF**

**HENRY HARTLEY**

**VOLUME I**

**TAKEN ON BEHALF OF THE PLAINTIFF**

April 13, 2009
10:00 a.m. - 1:49 p.m

515 East Las Olas Boulevard
Fort Laudedale, FL

SARA CONWAY, RPR



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

53

1 discrimination made by an employee?
2   A. Yes, I went to several of the seminars for
3 EEOC, I had at least three or four libraries of books
4 I brought back. Basically they were the same only
5 updates in them. I went to the EEOC training probably
6 five times.
7   Q. Did you ever read those books cover to cover?
8   A. Yes, I did.
9   Q. How many pages are there?
10     MS. LANGBEIN: Objection to form. You're
11 harassing the witness.
12     MR. CELLER: I don't believe I'm harassing
13 him.
14   A. I don't know.
15   Q. My question is -- You said a it's 12-volume
16 binder.
17   A. I'm only guessing. It's 10 to -- It was at
18 least 10 or 12 booklets.
19   Q. Okay. Just for the record, and I'm going to
20 hold this up in front of the camera, I want you to take
21 a look at this binder, just the size of it. Does this
22 represent approximately the size and thickness of each
23 of those booklets?
24   A. No.
25   Q. What's the difference?

54

1   A. The booklets that you got on each one was
2 they were probably one inch thick.
3   Q. Each?
4   A. Each. Plus, at the seminar you had a full
5 binder too which was a work binder.
6   Q. Okay. And what was in that work binder?
7   A. Over the topics that were being discussed
8 that they and who was presenting it and after each one
9 there was areas for notes.
10   Q. Did you ever personally conduct any training
11 at Kent -- at the defendant's offices to employees
12 regarding how to investigate or deal with a claim of
13 discrimination?
14   A. No.
15   Q. Did you ever, for example, discuss with Leita
16 Tolintino how to best investigate a claim of
17 discrimination?
18   A. No.
19   Q. Other than these EEOC seminars that you
20 attended, you said approximately five of them, have you
21 ever had any other training specifically on how to
22 investigate a claim of discrimination?
23   A. No.
24   Q. During Mrs. Greenfield's -- During the
25 investigation into Mr. Greenfield's allegations of

55

1 discrimination, did you refer to the binder?
2     MS. LANGBEIN: Objection to form.
3   A. No.
4   Q. Did you use any of the techniques that you
5 claim you learned at any of these EEOC seminars on how
6 to investigate a claim of discrimination?
7   A. I used what's common knowledge what I
8 developed over 35 years of being in the trade.
9   Q. My question though is did you specifically
10 use any of the materials that you maintained you
11 learned from the EEOC to conduct your investigation
12 into Mr. Greenfield's allegations of discrimination?
13     MS. LANGBEIN: Objection to form.
14   A. I don't understand the question then.
15   Q. Okay. Let me see if I can clarify it, and I
16 appreciate you for saying that. You said you didn't
17 refer to any of the materials in conducting the
18 investigation, correct?
19     MS. LANGBEIN: Objection to form.
20   A. I didn't go into each book and open it, yeah,
21 this is what I'm going to do and this. What I go by is
22 common knowledge that I have learned over the years.
23   Q. Prior to Mrs. Greenfield's allegations of
24 discrimination, how many discrimination investigations
25 had you conducted?

56

1     MS. LANGBEIN: Objection to form.
2   A. I can't give you a number. There's been a
3 few, yes.
4   Q. Okay. Had you ever had a managerial employee
5 make a claim of discrimination prior to Mrs.
6 Greenfield?
7   A. No.
8   Q. Can you identify for me the different types
9 of investigations that you took on related to
10 discrimination, harassment or retaliation prior to Mrs.
11 Greenfield's allegations?
12     MS. LANGBEIN: Objection, asked and answered.
13   A. That I have investigated myself?
14   Q. During your employment with the defendant,
15 correct.
16   A. That went to court or never went to court?
17   Q. Any of them.
18   A. Okay. There's many -- There was one with --
19 There was one sexual harassment.
20   Q. Let me pause you there. Tell me what you did
21 to investigate that allegation of sexual harassment.
22   A. First I ask the person to put in writing.
23   Q. Okay.
24   A. And then I go by -- I try to follow-up on
25 everything that they have stated, witnesses, so on so



Tol. Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

### Page 81

  1    A.  I was waiting for her to put everything in
  2  writing so I could follow-up on everything, yes.
  3    Q.  And assuming that she had put Exhibit Number
  4  2 in writing, would that have been sufficient enough
  5  for you had you known about it?
  6    A.  I would have started --
  7    MS. LANGBEIN:  Objection to form.
  8    A.  -- but I wanted specific things that she was
  9  talking about, you know.
10    Q.  Okay.  Now, you also invited KSS's paralegal,
11  Leita Tolintino, to sit in with you; is that what you
12  write in paragraph 10?
13    A.  Correct.
14    Q.  Why would Mrs. Tolintino be involved in that
15  investigation?
16    A.  Because she was a legal assistant.
17    Q.  What qualifications, if any, were you aware
18  of that she had that would qualify her to conduct an
19  internal investigation into allegations of
20  discrimination?
21    MS. LANGBEIN:  Objection to form.
22    A.  I don't know.
23    Q.  Do you know whether Mrs. Tolintino had ever
24  conducted any sort of or sat in on any sort of
25  discrimination investigation training?

### Page 82

  1    A.  I don't know.
  2    MS. LANGBEIN:  Objection to form.
  3    Q.  What role did Mrs. Tolintino play during the
  4  investigation into Mrs. Greenfield's allegations --
  5    MS. LANGBEIN:  Objection to form.
  6    Q.  -- of discrimination?
  7    A.  I don't know.
  8    Q.  You were in charge of the investigation,
  9  correct?
10    A.  No.
11    Q.  Who was in charge of it?
12    A.  It was a legal department.  I think they
13  turned it over to an attorney.
14    Q.  When did they do that?
15    A.  I don't know.
16    Q.  Did you receive any direction from Mr.
17  Newman, Gill Newman, as to how to conduct the
18  investigation into Mrs. Greenfield's allegations?
19    A.  No.
20    Q.  Did you ever interview Mr. Newman regarding
21  Mrs. Greenfield's allegations?
22    A.  I spoke to him briefly, yes.
23    Q.  And would that be documented anywhere?
24    A.  I think it's in one of the paragraphs here a
25  little bit.  I spoke with him -- I have it documented

### Page 83

  1  on my pad that wasn't typed up.
  2    Q.  It says here in paragraph 13 you then
  3  interviewed Mr. Newman to find out why he had demoted
  4  Mrs. Greenfield; do you see that?
  5    A.  Yes.
  6    Q.  Do you know why that's not reflected in what
  7  we marked as Plaintiff's Exhibit Number 1?
  8    MS. LANGBEIN:  Objection to form,
  9  speculative.
10    A.  No.  I didn't type this.  I typed my own.
11    Q.  Who was present during your conference with
12  Mr. Newman?
13    A.  As I recall, it was Leita.
14    Q.  Now it says in the next paragraph - I'm
15  sorry, in the next sentence in paragraph 10, Mrs.
16  Greenfield told us that she had been demoted over two
17  weeks ago, and she believed it was related to her
18  pregnancy.  Do you see that?
19    A.  On paragraph 10?
20    Q.  Yes.
21    A.  Yes.
22    Q.  Now you didn't even know at the time you
23  interviewed Mrs. Greenfield that she had been demoted,
24  correct?
25    A.  I didn't know it, I don't think, until she

### Page 84

  1  was telling us at that point right then.
  2    Q.  And as the compliance officer would that have
  3  been an important fact for you to know prior to going
  4  into your meeting with Mrs. Greenfield?
  5    MS. LANGBEIN:  Objection to form.
  6    A.  Yes.
  7    Q.  Okay.  But you didn't know at that point?
  8    A.  As far as I know, no.
  9    Q.  Now, when you interviewed Mr. Newman
10  regarding the reason for her demotions - for her
11  demotion, Mr. Newman told you that it was as a result
12  of her poor sales performance; is that correct?
13    A.  Yes.
14    Q.  What did you do independently to corroborate
15  Mr. Newman's story?
16    A.  Nothing, I didn't do nothing about it right
17  then, I just made notes of it at the time, and I was
18  waiting for her to bring me her thing back.
19    Q.  Did you go and look at her sales records at
20  that time?
21    A.  No.
22    Q.  Did you go and compare her sales records to
23  the year prior?
24    A.  No.
25    Q.  After Mrs. Greenfield left, did you ever go



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 954.987.7780
Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com

123

1  now because, brackets, she, end brackets, and pregnant?
2      A.   No.
3      Q.   Okay. Go ahead and highlight that. And I
4  can ask it differently if it's easier. Did you ever
5  say to her anything said to Mrs. Greenfield could be
6  taken out of context?
7      A.   No.
8      Q.   Okay. Go ahead and highlight that. Take a
9  look at the rest of that paragraph. Did Mrs.
10 Greenfield indicate to you that during her first
11 pregnancy she had never been treated this way?
12     A.   I don't remember that.
13     Q.   Okay. Do you know whether you said to her
14 that she is more sensitive because of the hormones and
15 that you knew because you had gone through it with your
16 wife? You deny you said that, right?
17     A.   I deny because I don't even know what
18 hormones are and how it makes you react. I'm not a
19 doctor.
20     Q.   Okay. So why don't you go ahead and
21 highlight that last - the last sentence of paragraph 2.
22 Let's go to paragraph 3 when you're done. Let me
23 know when you're ready for paragraph 3, Mr. Hartley.
24     A.   So basically that whole paragraph gets
25 highlighted, correct?



Toll Free: 877.495.0777
Facsimile: 954.987.7780

Suite 1300
515 East Las Olas Boulevard
Fort Lauderdale, FL 33301
www.esquiresolutions.com